Oliver v. Forbes.

JOHN J. OLIVER, *et al.*, V. ROBERT FORBES.

POTTAWATOMIE INDIAN TREATY; *Deed Executed by Heirs of Deceased Allottee, before Patent issued, Held Valid.* Under the provisions of the Pottawatomie Indian treaty of 1861, (12 U. S. Stat. 1192,) John Riley, a Cherokee Indian by birth, but a Pottawatomie Indian by adoption, was the allottee, and held the certificate, for the land now in controversy. In 1864 he died, leaving a widow who was a Pottawatomie Indian woman, and two minor children, both girls. On July 27th 1867, said widow executed a general warranty deed for an undivided-half of said land to Thomas J. and Julia Lazzelle, Julia being a half-breed Pottawatomie Indian woman; and on the same day the Lazzelles executed the same kind of deed for the same land to the Olivers. On October 27th 1868, said widow executed another general warranty deed for the same land, but this time she executed it directly to the Olivers. On April 10th 1869, the said Olivers took possession of said land, have occupied the same ever since, and have made improvements thereon worth from $1,250 to $1,500. On May 16th 1870, the United States issued a patent for said land to said allottee, John Riley, and his heirs. On February 3d 1872, said widow executed still another general warranty deed for said land, but this time she executed the same to Robert Forbes. Forbes then commenced an action in the nature of an ejectment to recover said land from said Olivers: *Held*, Under the facts of this case, under the Pottawatomie treaties of 1861, 1866 and 1867, and under the law for the recovery of real property in this state, that said action cannot be maintained.

*Error from Shawnee District Court.*

EJECTMENT, brought by *Forbes* against *Oliver* and *Oliver*, to recover possession of the N.E.¼ of sec. 35, town 10, range 14, situated in Shawnee county. The action was tried at the

December Term 1873, and resulted in a judgment for *Forbes*. The *Olivers* bring the case here on error. The briefs of counsel, and opinion of the court, *infra*, contain sufficient statements of all necessary facts.

*A. H. Case*, and *J. H. Putnam*, for plaintiffs in error:

John Riley, a member of the Pottawatomie tribe of Indians, in 1862, was married to Mary Beaubien, a Pottawatomie Indian woman, by whom he had two children, now minors. In 1863, the United States allotted to him, as under the treaty of November 15th 1861, 160 acres of land, and duly issued a certificate therefor to him. In the year 1864 he died in Kansas, leaving his widow and the two children aforesaid. In 1865 his widow married David Bostick, with whom she is still living. On the 27th of July 1867, she and her husband, by covenants of general warranty, conveyed an undivided-half interest in the land to Thomas J. and Julia Lazzelle, the said Julia being a Pottawatomie Indian woman; and on the same day the Lazzelles, by like covenants, conveyed the same land to the Olivers. On the 27th of October 1868, Mary Bostick and her husband, David, again conveyed an undivided-half interest in the land by covenant of general warranty to the Olivers. All these deeds were duly recorded prior to May 1870. On the 10th of April 1869, the Olivers took possession of an undivided one-half interest in the land, and ever since have occupied it, and have put valuable improvements thereon. On the 16th of May 1870, the United States issued a patent for said 160 acres "to John Riley, and his heirs." On the 3d of February 1872, Mary and David Bostick, by covenants of general warranty, conveyed said land to Forbes. The district court held that Mary Bostick had no right and power of alienation in the manner and form shown before the issuing of said patent of May 16th 1870, and thereupon found in favor of Forbes.

1. Under art. 2, treaty of 1861, John Riley received his certificate of allotment of land, which by the language of

that article "are set apart for the perpetual and exclusive use of such assignees, and their heirs," and, "until otherwise provided by law," such tracts might be "alienable" only to the United States, and to persons then being members of the Pottawatomie tribe of Indian blood, with the permission of the president, and under certain regulation, except as provided in art. 3 of said treaty. Said art. 3 provides for the naturalization of the Indians, and for the issuance of patents, etc. Had John Riley lived, his patent would not have been issued until these conditions of the treaty were complied with; but he died, and under the 8th article of the treaty of 1867, the patent in this case was issued. John Riley, as an allottee, under this article, "is to be regarded for the purpose of a careful and just settlement of his estate as a citizen of the U. S. and of the state of Kansas, and it shall be competent for the proper courts to take charge of the settlement of his estate under all the forms and in accordance with the laws of the state as in the case of other citizens deceased." This 8th article, treaty of 1867, removes the restrictions in the 2d and 3d articles of the treaty of 1861, for it is here in this article "otherwise provided by law" how and in what manner such tracts shall be subject to levy, taxation, sale and disposal, to-wit, "the same as the lands of any other citizen." Any other construction of art. 8 is absurd, and would defeat the end and object of the law. If it was the intention of the treaty-making power to still attach the restrictions contained in the treaty of 1861, such restrictions would have been incorporated in the treaty of 1867 in plain and unambiguous terms; but in this article we are told that the courts of Kansas are to take charge of their estates in case of their decease, where they have no patent, but have their certificates of allotment, "under all the forms and in accordance with laws of state as in the case of other citizens deceased." The United States recognize this art. 8, and in pursuance thereof issue the patent to "John Riley *and his heirs.*" Under the laws of Kansas then in force, (Comp. Laws 1862, p. 469, § 5, and p. 697, § 7,) the land on

his decease descended, one-half absolutely to Mary Riley, his widow, (5 Kas. 384.) The title on the assignment and issuance of the certificate, and his decease, passed absolutely to her; (9 Kas. 38; 6 Cranch, 87 to 148.) The issuing of the patent was a mere ministerial act; 2 How. 284; 6 Mo. 106; 1 Ala. 660; 5 Porter, 243; 13 Cal. 419; 2 Wall. 535. And when the patent issued, it related back to 1863, (the original certificate of allotment,) and Riley's title dates from that time; (8 Iowa, 360;) and when issued it inured to the benefit of the Olivers, (who purchased after the treaty of 1867, and before the deed to Forbes;) Comp. Laws 1862, ch. 41, § 4; 3 McLean, 107; 7 Penn. St. 75; 2 How. & McH. 459; 16 La. An. 263; 1 How. & J. 6; 5 Iowa, 189; 29 Mo. 94; 8 Kas. 122. And such title would inure to the benefit of the first grantee, by estoppel, to the exclusion of a second grantee, to whom the grantor shall execute a deed after having acquired a title; 24 Pick. 322; 2 Der. 177; 13 N. H. 389; 53 Penn. St. 351. The title to the land after the restrictions were removed, and before the issuance of the patent, was such that could be devised, aliened; it would descend and might be devised the same as any other legal title; 3 Washb. 176 to 179. Originally, the land was the exclusive property of the U. S., to be disposed of to such persons at such times and in such mode, as well as by such title, as the government may deem proper; 3 Washb. 168, 169. The U. S. saw fit to pass the title by assignment, with restrictions, subject to the restrictions being removed in case of death of John Riley before patent issued; art. 2, treaty of 1861, and art. 8, treaty of 1867. And as soon as the contingency arose, provided for in article 8, the title passed absolutely from the U. S. to Mary Bostick, and it took the character of other property within the state, and was subject to state legislation; 13 Peters, 516, 436; 16 La. An. 89. The restrictions in articles 2 and 3, treaty of 1861, were personal, and did not run with the land; 4 McLean, 82; 3 Kas. 355; 8 Kas. 112; 13 Wis. 291; 29 Wis. 383; 10 Ala. 638; 1 Iowa, 575; 8 Cowen, 189.

The woman must be naturalized under articles 2 and 3,

treaty of 1861, and article 6, treaty of 1867, before she could dispose of the lands allotted to her by the United States, under the treaty of 1861. If the land descended to her were subject to the same restrictions as to sale, she must be naturalized before her deed would convey a title. There is no proof of her naturalization, but proof of her tribal relation, and Indian blood; and until the contrary is shown, she is presumed to be unnaturalized—an Indian, not a citizen. In what way, if not by virtue of art. 8, treaty of 1867, were her disabilities removed? Did the issuance of the patent to her dead husband, remove her disabilities? It did not make *him* a citizen, within the meaning of art. 3, treaty of 1861. It did not make *her* a citizen within the meaning of art. 6, treaty of 1867. If she is still laboring under the disabilities mentioned in art. 2 of treaty of 1861, by what logic and reasoning does the *subsequent deed of Forbes* give him the right of possession against Oliver? If she had any title to convey without the intervention of the president and secretary of interior, after the treaty of 1867, such right of conveyance was in nowise affected by the issuance of the patent. If she had no right of conveyance after the treaty she had none after the issuance of the patent. That instrument did not give nor take away her right of conveyance. She could not make a *valid deed to Forbes*, unless she could make a *valid deed to Oliver*; and if neither deed is valid, the possession of Oliver could not be disturbed by Forbes.

*Martin, Burns & Case*, for defendant in error:

By the second article of the treaty between the United States and the Pottawatomie Indians, made November 15th 1861, it is provided that an accurate census of the number of the Indians should be made, and that thereafter there should be assigned to each chief one section of land — to each headman, one-half section — to each other head of a family, one quarter-section, and to each other person, eighty acres of land, and certificates for the tracts so assigned were to be issued to each person. (The certificates were to contain certain facts not

necessary to be considered in this case.) It is further pro-
vided in the same article that "until otherwise provided by
law, such tracts shall be exempt from levy, taxation or sale,
and shall be alienable in fee or leased or otherwise disposed
of only to the United States, or to persons then being mem-
bers of the Pottawatomie tribe, and of Indian blood, with
the permission of the president, and under such regulations
as the secretary of the interior shall provide, except as here-
inafter provided."

In the case at bar it is not claimed that the president ever
gave his permission to sell the land in controversy prior to
May 16th 1870, nor that the secretary of the interior ever
made any rules or regulation providing for or authorizing
conveyances of these lands prior to that date. By the 3d
article of the same treaty it is provided in substance that
under certain circumstances and conditions adults, being
males and heads of families, might be admitted to citizen-
ship, and that *thereafter* the president was authorized to
cause patents to be issued to them *"with power of alienation."*
There is no claim that Riley was ever admitted to citizen-
ship, or that a patent was issued to him in his lifetime. On
29th March 1866, a supplemental treaty was made between
the U. S. and the Pottawatomies. By the 1st article of this
treaty, the provisions of the 3d article of the first-named
treaty was "extended to *all adult* persons of said tribe with-
out distinction of sex, whether such persons are or shall be
heads of families or otherwise, in the same manner, to the
same extent and upon the same terms, conditions and stipu-
lations as are contained in said 3d article of said treaty, with
reference to males and heads of families." On 27th Febru-
ary 1867, another treaty was made between the U. S. and the
Pottawatomies, and before the ratification thereof certain
amendments were proposed by the senate and agreed to by
the Indians. By the 6th article of this treaty the 3d article
of the treaty of 1861, (proclaimed April 19th 1862,) was
continued in force, with the additional provision, that before
patents should issue to the Indians for their lands in sever-

alty, the agent should make a certificate showing that the applicant was competent to manage his own affairs; and a like certificate was required from the business committee; and by the same article the rights of citizenship are extended to the families of such Indians as have become citizens. The 8th article of this treaty, as amended by the senate, is the only remaining article that has any bearing on the matters in controversy in this action. This article reads as follows:

"Where allottees under the treaty of 1861 *shall have died,* or shall hereafter decease, *such allottees* shall be regarded for the *purpose* of a careful and just *settlement of their estates,* as *citizens* of the United States and of the *state of Kansas,* and it shall be competent for the proper courts to take charge of the settlement of their estates under all the forms, and in accordance with the laws of the state, as in the case of other citizens deceased; and in cases where there are children of allottees left orphans, guardians for such orphans may be appointed by the probate court of the county in which such orphans may reside, and such guardians shall give bonds to be approved by the said court, for the proper care of the person and estate of such *orphans,* as provided by law."

The court will observe, that the grant made by article 2 of the treaty of 1861 was not a grant *in fee,* but is specially limited to "*the exclusive use and benefit of such assignees, and their heirs,*" perpetually; and we think it clear, that *Riley took only a life estate.* This being so, it clearly follows, that he had no power to convey it. Upon Riley's death, the estate passed to *his heirs,* not by *descent,* but by *purchase, or grant,* and *they* took the estate subject to all the restrictions and limitations imposed by the terms of the original grant. They had no more power to sell it than Riley had, because the grant followed *to their heirs,* and so on perpetually, until the restrictions and limitations imposed by the treaty should be removed. The primary object of the grant was to furnish a home for the Indians, and *their heirs forever;* and a conclusion different from that which we have arrived at would defeat the very object of the treaty. That the U. S. had a right to make the grant, and to attach the conditions and limitations it did to the grant, we do not suppose will be

controverted.   Then we find that the government granted to
Riley a *life estate* in the land in controversy; that at his
death the *same estate* passed to his heirs, and *without power* of
*alienation* in either *Riley,* or *his heirs,* or their heirs, except
to persons of Indian blood being members of the Pottawat-
omie tribe or nation and with the consent of the president
under such rules and regulations as the secretary of the in-
terior should prescribe.   Said secretary never prescribed any
rules respecting such conveyances, nor has the president ever
consented to the conveyances made by Mrs. Bostick.and her
husband to the Olivers.   Nor did Riley in his lifetime, nor
did his widow after his death and prior to 16th May 1870,
comply with or avail herself of the privileges and benefits
contained in the 3d article of the treaty of 1861; and in no
way or manner could Riley or his heirs, or their heirs, con-
vert his or their *life estate* into an *estate in fee* except by a
compliance with the provisions of said 3d article.   It is per-
fectly clear from an examination of art. 3 that *only a life
estate* was intended to be granted by art. 2; and the whole
object and purpose of art. 3 is to provide a means by which
this life estate might be converted into an *estate in fee,* and
certain conditions beneficial to the U. S. and the state of
Kansas are imposed by art. 3 upon parties who seek to ob-
tain a fee-simple title, as a consideration for such change.

But it is insisted that these restrictions upon the power of
alienation have been removed in two ways: First, by the
death of Riley — upon the theory that these restrictions were
*personal as to him,* and were removed by his death; and sec-
ondly, by the 8th article of the treaty of February 27th
1867, as amended by the senate.   Our answer to the first
proposition has been fully given already, namely, that Riley
had only a *life estate* in the land; that his heirs took the
same estate by purchase or grant; that the conditions and
limitations on the power of alienation follow the land in the
hands of Riley and his heirs and their heirs forever, until
the estate is changed in the manner provided in the 3d
article of the treaty of 1861; and if the *restrictions* im-

posed by the grant were personal to John Riley, they are personal in precisely the same manner and to the same extent to his heirs and their heirs perpetually, until removed in the manner already suggested. The answer to the second proposition is twofold: 1st, The restrictions imposed, and the nature of the estate granted, by the 2d article of the treaty of 1861, were not removed or changed in any respect by the 8th article of the treaty of 1867, as amended by the senate. 2d, The parties to that treaty never intended to do so, as a fair and careful examination of that article will clearly demonstrate. By art. 8 of the treaty of 1867, *as it was originally signed*, it is provided in substance that "if any dispute shall arise in *regard to heirship* to the property of any allottees under the treaty of 1862 [1861] who were then dead or might thereafter die, the business committee of the nation was authorized to decide such question." What question? *Only the question as to who were or are heirs* — nothing more; and in deciding *that question* they were to take "for *their rule of action the laws of inheritance* of the state of Kansas;" and in case there were orphan children left by allottees, guardians should be appointed for them by the same business committee, and such guardians were to give bonds to be approved by the agent of the nation or the superintendent, and the duty of the guardian, and the condition of the bond, was simply "*for the faithful management of the* property of such orphans until their arrival at their majority." We submit that the whole effect of this article was, *first*, to authorize the business committee to determine who were heirs, in case of controversy on that point, such heirship to be determined according to the laws of Kansas; *second*, to authorize the business committee to appoint guardians for orphan children; *third*, the guardians so appointed were empowered to *manage the property of such orphans until their arrival at their majority*. And instead of conferring power on the guardians to sell the property of the orphans, it does just the opposite. The very language used, that is, "for the faithful *management* of the property of such orphans *until* their arrival at their majority," excludes the

9—17 KAS.

idea of a power to sell the property.    Nor is there a word to be found in the article that tends in the least degree to intimate that the character of the original grant was to be changed or affected in any form or manner.    Now the senate *struck out this article,* and inserted in lieu thereof article 8 as it now stands, which provides in substance that where allottees under the treaty of 1861 have died or shall thereafter die, they shall be regarded as citizens of the United States and of the state of Kansas for the *purpose* of a careful and *just settlement of their estates;* and the *courts of Kansas* are authorized to take *charge of the settlement of their estates* under all the forms and in accordance with the laws of Kansas, as in the case of other deceased citizens; and in cases where such allottees left orphan children, the probate courts were authorized to appoint guardians for such orphans for the proper care of the persons and estates of such orphans as provided by the laws of the state. We submit that this substituted article does substantially what the original article did, and no more, except it places the power to do the *same things* in the proper *courts of the state* instead of the *business committee of the nation.*    It does not remove or pretend to remove the restrictions imposed by the treaty of 1861—nor does it change or purport to change the character of the grant made by that treaty; but upon the contrary, the 6th article of the treaty of 1867 expressly continues in force the 3d article of the treaty of 1861, and imposes additional burdens and restrictions upon the Indians.

Let us examine this 8th article carefully, and see just what it does do: It provides that for the *purpose* of a just and careful *settlement* of the *estates of deceased allottees* they shall be *regarded,* that is, treated as citizens of the United States and of the state of Kansas; that is, their estate shall be settled in accordance with the laws of Kansas; and for the purpose of making this *settlement,* the *courts* of the state shall have jurisdiction; but the rights of parties under the treaty are not changed, the restrictions upon the power of alienation are not removed.    Not only is this true, *but this case* does not in any respect fall within the class of cases or

contingencies provided for by this article. This is not a proceeding for the *settlement* of an estate, or for the protection or enforcement of any right growing out of the *settlement of an estate*. The courts have had nothing to do with the settlement of this estate; nor was the district court called upon to do anything of that kind; nor is this court. Therefore article 8 has no reference or relation to a controversy of this kind. The case of *Farrington v. Wilson*, 29 Wis. 383, is entirely different from the case now before this court. In the Wisconsin case the grant was to *Antoine Grignon*, with the restriction that *he* should not sell or lease the land to any person. The patent was to "*Antoine Grignon,* his heirs and *assignees*." The restriction in that case, was *confined* to Grignon, and was personal to him; and the court say that it was good as to him—but not against his *heirs*. The *restriction* was clearly repugnant to the grant to him and his *heirs* and *assigns*. In the case at bar the restrictions are expressly extended to *Riley* and *his heirs;* the restrictions are personal to *Riley* and *his heirs;* the estate granted is limited to *him* and to his *heirs* from generation to generation, until the restrictions are removed as contemplated by the 3d article of the treaty of 1861. It is insisted however, that if the conveyances made by Bostick and his wife prior to May 16th 1870, are void, that the conveyance made by them after that date to Forbes was also void. We think not, for the law presumes that Mrs. Bostick had complied with the provisions of art. 3 of the treaty of 1861, at the *date of the patent, but not before*. The patent is *prima facie* evidence at least, that all the conditions precedent to its issuance had been complied with by the heirs of John Riley at the date of the patent. This presumption arises with and commences to run from the *date of the patent, but not before*. Not only this, but the law presumes in favor of the regularity of the proceedings of the officers of the United States in isssuing the patent. We think this a full and complete answer to the objection to the conveyance from Bostick and wife to Forbes.

The opinion of the court was delivered by

VALENTINE, J.: This was an action in the nature of ejectment, brought by Robert Forbes to recover from John J. Oliver and Emily L. Oliver a certain piece of land. Judgment was rendered in favor of the plaintiff, and the defendants now as plaintiffs in error bring the case to this court. The facts of the case as shown by the record are substantially as follows: The land in controversy was originally a part of the Pottawatomie Indian reservation. Under the provisions of article 2 of the Pottawatomie treaty of 1861, (12 U. S. Stat. at Large, 1192,) said land was allotted to John Riley, a Cherokee Indian by birth, but a Pottawatomie Indian by adoption, and the proper certificate for said land was duly issued to him by the commissioner of Indian affairs. Said article 2 provides among other things as follows:

"When such assignments shall have been completed, certificates shall be issued by the commissioner of Indian affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned, respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of such assignees and their heirs. Until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee or leased or otherwise disposed of only to the United States, or to persons then being members of the Pottawatomie tribe and of Indian blood, with the permission of the president, and under such regulations as the secretary of the interior shall provide, except as may be hereinafter provided."

The last clause refers to the following provisions of article 3 of the treaty:

"At any time hereafter, when the president of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provisions of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the requests of such persons, cause the lands severally held by them to be conveyed to them by patent in fee simple, with power of alienation." "And on such patents being issued, * * * such competent persons shall cease to be members

of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the property of other citizens; *Provided*, that, before making any such application to the president, they shall appear in open court, in the district court of the United States for the district of Kansas, and make the same proof and take the same oath of allegiance as is provided by law for the naturalization of aliens, and shall also make proof to the satisfaction of said court that they are sufficiently intelligent and prudent to control their affairs and interests, that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families."

Now John Riley was a male, and a head of a family; but he was the head of a family only two years and four months, and not five years. He was married to Mary Beaubien, a Pottawatomie Indian woman, on May 1st 1862, and died September 1st 1864. It is not shown that he ever made any application to the president for a patent for said land, or that he ever made any such proof as is required by said article 3, or that he ever took said oath of allegiance, or that he ever did anything else for the purpose of removing restrictions and disabilities from himself, or of perfecting and completing his inchoate title to said land. It is not shown that he ever had the least desire to become a citizen of the United States, or to sell his said land, or to be able to sell the same. In 1864, when he died, he left a widow (said Mary Beaubien Riley) and two minor children, both girls, and daughters of himself and said Mary. Said widow and children are still living. In 1865 the widow married David Bostick, a white man, a citizen of the United States, and a resident of Kansas. By the provisions of the Pottawatomie treaty of 1866, the provisions of the third article of the treaty of 1861 were "extended to all adult persons of said tribe without distinction of sex, whether such persons are or shall be heads of families or otherwise, in the same manner, to the same extent, and upon the same terms, conditions, and stipulations as are contained in said third article of said treaty with reference to 'males and heads of families.'" (14 U. S. Stat. at Large, 763.)

On July 27th 1867, said David and Mary Bostick executed a general warranty deed for an undivided-half of said land to Thomas J. Lazzelle and Julia Lazzelle his wife, Julia being a half-breed Pottawatomie Indian woman; and on the same day the Lazzelles executed the same kind of a deed for the same land to said John J. and Emily L. Oliver, the plaintiffs in error, defendants below. Article 6 of the Pottawatomie treaty of 1867, which took effect in August 1868, provides, that—

"The provisions of article third of the treaty of April 19th 1862, relative to Pottawatomies who desire to become citizens, shall continue in force, with the additional provision that, before patents shall issue to such persons, a certificate shall be necessary from the agent and business committee that the applicant is competent to manage his own affairs; * * * and where any member of the tribe shall become a citizen under the provisions of the said treaty of 1862, the families of said parties shall also be considered as citizens, and the head of the family shall be entitled to patents; * * * and women who are also heads of families, and single women of adult age, may become citizens in the same manner as males." (15 U. S. Stat. at Large, 533.)

The said treaty of April 19th 1862, is the treaty that we have denominated the treaty of 1861. It was concluded November 15th 1861; consented to, with amendments, by the senate, April 15th 1862; again consented to by the Indians April 17th 1862, and affirmed and proclaimed by the president April 19th 1862. Article 8 of the treaty of 1867, which took effect in August 1868, provides that—

"Where allottees under the treaty of 1861 shall have died, or shall hereafter decease, such allottees shall be regarded, for the purpose of a careful and just settlement of their estates, as citizens of the United States, and of the state of Kansas; and it shall be competent for the proper courts to take charge of the settlement of their estates under all the forms and in accordance with the laws of the state, as in the case of other citizens deceased; and in cases where there are children of allottees, left orphans, guardians for such orphans may be appointed by the probate court of the county in which such orphans may reside, and such guardians shall give bonds, to be approved by the said court, for the proper care of the per-

son and estate of such orphans, as provided by law." (15 U. S. Stat. at Large, 536.)

The said treaty of 1861 is the same as the said treaty of April 19th 1862. (See above explanation.) On October 27th 1868, said David and Mary Bostick executed a general warranty deed for the undivided-half of said land to said John J. and Emily L. Oliver; and on April 10th 1869, the said Olivers took possession of said land, have continued to occupy the same ever since, and have made improvements thereon worth from $1,250 to $1,500. On the 16th of May 1870, the United States issued a patent for said land to the allottee, John Riley, and his heirs. Now the John Riley to whom this land was allotted had been dead for more than five and-a-half years when this patent was issued. On February 3d 1872, said David and Mary Bostick executed a general warranty deed for said land to Robert Forbes, defendant in error, plaintiff below. All the foregoing deeds were duly recorded in the order of their execution.

Did Forbes get any title to said land by virtue of said last-mentioned deed, as against the said Olivers? This is the only question in the case. Now in order to determine this question in the affirmative, it is necessary to hold that the Bosticks had no power to execute deeds for said land, or to bind themselves by covenants concerning the land at the times when they executed said deeds to the Lazzelles and to the Olivers, but that they had such power when they executed said deed to Forbes. Now why had they such power in the latter case, and no such power in the former cases? No sufficient reason can be given; and no reason at all can be given except the mere issuance of said patent. Now how can that be considered a sufficient reason? We cannot tell. Originally, the land in question belonged to John Riley; but he had no power to sell or to incumber the land, except in a certain manner, and except upon certain terms and conditions. He died, and it descended to his heirs, one-half to his widow, and the other half to his two children. Now if the restrictions upon the sale of said land were merely personal to John

Riley, then of course his widow after his death could sell and convey her interest in the land, and in that case the deed she and her husband David Bostick executed to the Lazzelles would be considered good and valid.  But suppose that said restrictions were not merely personal to John Riley, but that they followed the land to his heirs, to his widow and children: then, if, by a legal fiction, under article 8 of the treaty of 1867, John Riley because of his death was to be considered as a citizen of the United States, and his estate as that of a citizen, and if, by a like legal fiction, under article 6 of the same treaty, his family, his wife and children, were to be considered as citizens, then the deed executed in 1868 by his widow, Mary Bostick, to the Olivers, must be considered as valid and binding.  But suppose that the said widow, the said Mary Bostick, is not to be considered as having become a citizen by virtue of the death of Riley, and the provisions of said treaty of 1867, and that the restrictions upon the sale of said land were still in force when she and her husband executed said deed to the Olivers, so that said deed is void: then what has happened since that time to remove said restrictions, and to give her such ample power to make a valid deed for said land that we must now consider the deed made by her and her husband to Forbes as a good and valid deed? We know of nothing.  She has never made any application to become a citizen of the United States, or to have any said restrictions removed.  She has never made the necessary proofs, nor obtained the necessary certificates, nor taken the necessary oath, for any such purpose.  Then how could she make a valid deed in 1872, if she could not have done so in 1868?  The only answer that can be given is, that said patent was issued in 1870.  Said patent recites that "John Riley" was the allottee for said land, and then it grants the land to John Riley and to his heirs, "to have and to hold" the same "to said John Riley and to his heirs and assigns forever." Now, how can this patent give to Mary Bostick the power to convey said land?  It does not purport to give her any such power.  It does not purport to make her a citizen.  It is not

issued to her by name. Indeed, her name is not mentioned in the patent at all. And while she must take as an heir of John Riley, if she takes anything under the patent, yet she is not designated in the patent as an heir. The word "heirs," as used in a conveyance, is not a word of purchase, but is merely a word qualifying the title of the grantee mentioned in the conveyance. (*Hunter v. Watson*, 12 Cal. 363.) We should judge from recitals in said patent that it was issued because of the following provisions of said treaty of 1867, to-wit: "Where allottees under the treaty of 1861 shall have died or shall hereafter decease, such allottees shall be regarded, for the purposes of a careful and just settlement of their estates, as citizens of the United States, and of the state of Kansas." (15 U. S. Stat. at Large, 536, art. 8.) "And where any member of the tribe shall become a citizen under the provisions of the said treaty of 1862 [1861] the families of said parties shall also be considered as citizens." (15 U. S. Stat. at Large, 533, art. 6.) And these provisions of said treaty were probably taken in connection with the act of congress of May 20th 1836, entitled "An act to give effect to patents for public lands issued in the names of deceased persons." Said act reads as follows:

"*Be it enacted*, That in all cases where patents for public lands have been or may hereafter be issued, in pursuance of any law of the United States, to a person who had died, or who shall hereafter die, before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees, or assigns of such deceased patentee, as if the patent had been issued to the deceased person during life." (5 U. S. Stat. at Large, 31.)

Now whether this patent is valid or invalid, we hardly think it is necessary to determine; for we think we should reach the same final conclusion in either case. (With respect to patents issued after the death of the patentee, see *Galt v. Galloway*, 4 Peters, 333; *McDonald's Heirs v. Smally*, 6 Peters, 261; *Galloway v. Finley*, 12 Peters, 264; *Landes v. Brant*, 10 How. 348; *Price v. Johnston*, 1 Ohio St. 390.) If the patent is valid, it is so merely because it is in confirm-

ation of preëxisting rights, and not because it created any new rights. And every right existing at the time it was issued, existed at the time and before Mary Bostick and her husband executed said deed to the Olivers. From the time she executed said deed to the Olivers until said patent was issued, nothing transpired to give her any greater rights, powers, or privileges than she previously possessed. If said patent was rightfully and legally issued, then it should have been issued at the latest as early as August 1868, at the time when the treaty of 1867 took effect, which was before Mary Bostick executed said deed to the Olivers; and it is a general rule of law, that when a patent is issued it relates back to the earliest moment when it ought to have been issued. It must also be remembered that the said deed to the Olivers was a general warranty deed. Now, John Riley in his lifetime had the equitable title to said land; and his certificate of allotment was sufficient evidence thereof. When he died, his wife and children succeeded to his rights by inheritance, and not by purchase. But we do not see that it would make any material difference, so far as this case is concerned, whether we should consider that they succeeded to his rights by purchase or by inheritance. In either case, his widow was either restricted in the sale of said land, or she was not so restricted. If she was restricted, then her deed to Forbes was void. But if she was not restricted, then either her deed to the Lazzelles, or her deed to the Olivers, was valid, and in either case Forbes by his subsequent deed would get no title. In any case, therefore, the plaintiff Forbes must be defeated. If Mary Bostick was at any time free from all restrictions in the sale of said land, it was either because the restrictions imposed by the treaty of 1861 were merely personal to their original allottees, or because such restrictions were in the present case removed by the death of the allottee and by the provisions of the treaty of 1867. Nothing else ever transpired to remove them. We suppose that it will not be claimed that the patent changed the status or condition of John Riley, for he had been dead for several years before it

was issued. And we hardly suppose it can be claimed that it changed the status or condition of his widow, Mary Bostick, for it does not purport to do so, even indirectly; and her name is not even mentioned therein.

The judgment of the court below will be reversed, and cause remanded for a new trial.

KINGMAN, C. J., concurring.

BREWER, J., not sitting in the case.