### WELCH v. ELLIS et al.

No. 6806—Opinion Filed Oct. 10, 1916.

Rehearing Denied March 6, 1917.

(163 Pac. 321.)

(Syllabus by the Court.)

**1. Indians—Allotment — Conveyance—Validity—Statutes.**

A deed to his surplus or homestead allotments, executed by a Cherokee freedman before attaining his majority and after the act of Congress of May 27, 1908 (35 Stat. 312, c. 199), took effect, is absolutely void, as violative of section 5 of said act.

**2. Same.**

Before the act of Congress of May 27, 1908, became effective, and before attaining his majority, W., a Cherokee freedman, executed a deed to his surplus allotment to E., receiving as a consideration therefor the full market value of the land. Thereafter, and after the passage of the act of May 27, 1908, and after he attained his majority, W. executed another deed to his surplus allotment to E., giving as a reason therefor that certain parties told him that he was not of age according to the rolls at the time the first deed was made, but the grantee had paid him all the land was worth, and he wanted to make a new deed without any further consideration, in order to make the grantee "safe." Held, (1) That the validity or invalidity of the last deed was governed by the terms of section 5 of the act of May 27, 1908; (2) that the deed executed after the grantee attained his majority was not void, as violative of section 5, supra.

**3. Same—Inadequacy of Price.**

Mere inadequacy of price, or any other inequality in the bargain, is not per se a ground to avoid the deed of an adult Cherokee freedman to his surplus allotment, either in equity or by the terms of any restrictive statute.

**4. Same.**

The same allottee, W., before attaining his majority, without actual fraud, and for a sufficient consideration, executed a deed to his homestead allotment to P. Thereafter, after the passage of the act of May 27, 1908, and after he had attained his majority, for a sufficient consideration, without knowledge thereof on the part of P., he sold the same tract of land to M. Thereafter, in good faith and for a valuable consideration, M. sold the same tract of land to P. Thereafter the allottee, by direction of M., executed a deed to said land directly to P. Held, that the last deed from the allottee to P. was not void, as violative of section 5 of the act of May 27, 1908.

Error from District Court, Nowata County; T. L. Brown, Judge.

Action by Frank Welch against G. W. Ellis and others. Judgment for defendants, and plaintiff brings error. Affirmed.

Wm. P. Thompson and C. Caldwell, for plaintiff in error.

Alvah C. Hough and W. D. Humphrey, for defendants in error.

KANE, C. J. This was an action for the recovery of 160 acres of land, situated in Nowata county, commenced by the plaintiff in error, plaintiff below, against the defendants in error, defendants below. The plaintiff was a Cherokee freedman, and the land involved consisted of his homestead and surplus allotments. In his petition he alleges, in substance, that on the 4th day of September, 1907, he signed what purported to be a warranty deed to his surplus allotment; that the defendant G. W. Ellis was the grantee in said deed; that at the time he executed said deed he was a minor, under the age of 21 years, and that the restrictions upon the alienation of said allotment imposed by act of Congress had not been removed; that on the 25th day of August, 1909, he made another deed to the same land to said defendants G. W. Ellis, J. A. Ellis, and W. I. Ellis; that said last deed was made by him at the solicitation of said defendants, without any contract to purchase or sell, and without consideration; that at the time he executed said second deed he was also an infant and incapable of conveying his lands; that on the 16th day of November, 1910, he, at the solicitation of the defendants, made another deed to said surplus allotment, without any further consideration being paid therefor; that said deed was based on the former contracts between him and the said G. W. Ellis, and was therefore void; that on the 24th day of September, 1912, said grantees made and executed an oil and gas mining lease to the defendant Paul Lovell, covering the entire

100 acres of his surplus allotment; that on the 24th day of October, 1912, the said Paul Lovell assigned said interest in and to said land to said defendants W. I. Hastings and H. G. Chamberlain; that the deeds made by him to said land were absolutely void, and in direct conflict with the provisions of all the acts of Congress, in force at the time said deeds were made, relating to the lands allotted to the citizens of the Cherokee Nation; that the defendants are in possession of said land without any right or authority from him; and that none of said defendants have any title or interest in said land, or any part thereof.

The allegations as to the homestead allotment are in substance: That on the 30th day of July, 1908, said plaintiff made a deed to his homestead to said defendant J. B. Pollard; at the time he made said deeds he was a minor, under the age of 21 years, and the restrictions upon alienation thereof imposed by act of Congress had not been removed; that on the 2nd day of September, 1910, the plaintiff made another deed to the said J. B. Pollard to his said homestead allotment; that said deed was made in pursuance of the contract made between the parties at the time of the execution of the first deed to said Pollard; that there was no new contract, nor any consideration paid, had, or received therefor; that on the 18th day of June, 1912, said J. B. Pollard made a deed to said homestead allotment to said defendant G. W. Ellis; that on the 24th day of September, 1912, said G. W. Ellis executed an oil and gas mining lease on all of said land, which composed said homestead, to said Paul Lovell, and the said Paul Lovell assigned his interest in said lease to the defendant and H. G. Chamberlain; that said plaintiff is now, and has been ever since said land was allotted to him, the owner of all of said allotted land and entitled to its possession; that the said deeds made by him were absolutely void, and in conflict with certain acts of Congress in force at the time of the execution of said deeds; that said defendants are in possession of the said land without any right or authority from him, and that none of said defendants have any title or interest therein, or any part thereof. Wherefore said plaintiff prays judgment against all of said defendants, canceling and setting aside all of said instruments; that the title to said land be quieted in said plaintiff free and clear of any and all claims of said defendants, or any of them; and that he be given judgment against all of said defendants for the possession of the entire tract of land, both as to his homestead and his surplus.

The defendants answered in two separate groups. Their separate answers, in so far as it is necessary to notice them, after denying each and every allegation contained in the petition of the plaintiff, admitted that the plaintiff is a citizen of the Cherokee Nation; that the land involved in said action was allotted to him, as stated in his petition, and the execution, delivery, and recordation of the various deeds, patents, leases, and assignments set up by the plaintiff, the first deed to the surplus having been executed prior to the passage of the act of May 27, 1908, which made the approved rolls conclusive as to age.

There was a great volume of oral and documentary evidence introduced or offered at the trial upon the only issue of fact joined by the pleadings, to wit, the age of the plaintiff at the time the first deed to his surplus allotment was executed, and a great many of the assignments of error contained in the petition in error of the plaintiff relate to the action of the trial court in the matter of the introduction or exclusion of this class of evidence. In view, however, of the conclusion we have reached as to the sufficiency of the evidence to support the finding of the trial court upon that question, it will not be necessary to review any of the assignments of error of this class.

The trial court found the plaintiff to be of full age at the time the first deed to his surplus was made, and entered judgment in favor of the defendants, and counsel now contend that, the finding of the trial court not being clearly against the weight of the evidence, this court is not at liberty to disturb it. Without commenting upon the evidence upon this point adduced at the trial, or setting it out at length, it is sufficient to say that after a careful examination of the record we are convinced that the finding of the trial court is clearly against the weight of the evidence. There is no doubt whatever in our mind that the plaintiff was a minor at the time he executed the first and second deeds to his surplus allotment, and that he was of full age at the time he executed the third deed thereto. We wish to say, however, that the evidence adduced at the trial convinces the court that at the time the first deed to the surplus was made the grantee therein was acting in good faith under the belief that the grantor was of age, that the defendant paid the grantor the full market value of the land at the time the first deed was executed, and that there was no evidence whatever of a fraudulent purpose on his part to defraud or overreach plaintiff in relation to the sale of his surplus allotment.

Finding that the first and second deeds to the surplus were executed before the plaintiff attained his majority, it must be held that they were absolutely void, as violative of section 72 of the Cherokee Treaty of July 1, 1902 (32 Stat. 726, c. 1375), and section 19 of the act of April 26, 1906 (34 Stat. 144, c. 1876), and not capable of subsequent ratification. The question, therefore, arises whether the last deed to his surplus allotment, executed by the plaintiff after he attained his majority, was void, as violative of any statute under the following state of facts, which we find to be established by the evidence.

G. W. Ellis, one of the defendants, testified as follows in relation to the last deed:

"Q. You took another deed in 1910? A. Yes, sir. Q. How come you to take that one? A. Just the same circumstances that I took the first one. Frank came and told me they had found out he was not of age according to the rolls at the time that deed was taken. Q. He came to you again? A. Came to me again, and along about that time he got his government patents, and he even brought them to me, and turned them over to me, and said they belonged to me, now that he had given me all the right that he had in that land, and we went and had this second deed made, as I told you. Q. And he told you he wanted to give you another deed? A. Yes, sir; he did. Q. Said they were still after him? A. Yes, sir. Q. You didn't care anything about it? A. I cared enough to take it. Q. You didn't care whether he gave it to you or not? A. Yes. Q. So this second and third deed was given on the solicitation of Frank himself? A. Just as I told you. Q. Yes; who made the third deed? A. I think Ben Scoville. Q. At whose direction? A. Mine. Q. Then you didn't go to Frank in 1910? A. I did not. Q. He came to you? A. Came to my barn—in fact, when the last deed was made, Frank was working for me at the barn at that time. Q. Did you give him any money? A. I did not. Q. Promise to pay him any? A. No, sir."

The following question and answer, which we take from another part of the examination of the same witness, more fully discloses the motive which actuated the plaintiff to execute the last deed:

"Q. How came you to take that deed? A. Well, Frank came to me, and told me there had been parties coming to him, and said he was not of age according to the rolls at the time he made that deed, and had been trying to buy the land, and he said that I had paid him all his land was worth, and that he was willing to sign any paper I wanted him to sign in order to make me safe, and I asked him then to go and make me another deed, and he did."

As we have hereinbefore stated, there was no actual fraud practiced by the grantees in the procurement of any of the deeds for the plaintiff's surplus allotment. The first deeds executed are void, because violative of the express provisions of certain acts of Congress restricting the alienation of allotted lands; and if the last deed is stricken down, it must be upon the same ground. It must not be forgotten that the right of a citizen of the Five Civilized Tribes to enter into a valid and binding contract is precisely the same as that of the ordinary citizen of the state, except as limited or restricted by some act of Congress. Therefore, if we find no such restrictions or limitations, the same rules of law must be applied to the contracts of both classes of citizens. Ordinarily, an adult person of sound mind may dispose of his real estate in any manner and for any consideration he sees fit, and the deed therefor will not be set aside, in the absence of fraud, duress, or mistake. Mere inadequacy of price, or any other inequality in the bargain, does not per se constitute a ground to avoid the bargain. Courts of equity, as well as courts of law, act upon the ground that every person who is not from his peculiar position or circumstances under disability is entitled to dispose of his property in such manner and upon such terms as he chooses; and whether his bargains are wise and discreet, or profitable or unprofitable, are considerations, not for courts of justice, but for the party himself to deliberate upon. 1 Story, Equity Jurisprudence, sec. 244.

In the case at bar the plaintiff was an adult person of sound mind at the time he executed the last deed, and there is no allegation or proof of actual fraud, duress, or mistake. The sole question, therefore, is: Was the last deed violative of any restrictive statute? It is settled in this jurisdiction that the act of May 27, 1908 (35 Stat. at L. 312, c. 199), was intended as a substitute for all prior laws, and operated to repeal all previous acts of like nature, and to establish a new scheme of restrictions governing the lands of citizens of the Five Civilized Tribes. McHarry v. Eatman, 29 Okla. 46, 116 Pac. 935; Lewis v. Allen, 42 Okla. 584, 142 Pac. 384. At the time of the passage of the act of May 27, 1908, the restrictions upon the lands of freedmen, both as to surplus and homestead allotments, were removed. Therefore we must look to section 5 of the act in determining the validity or invalidity of the deeds to both tracts. Section 5 provides:

"That any attempted alienation or incumbrance by deed, mortgage, contract to sell, power of attorney, or other instrument or method of incumbering real estate, made before or after the approval of this act, which affects the title of the land allotted to allottees of the Five Civilized Tribes prior to the removal of restrictions therefrom, and also

any lease of such restricted land made in violation of law before or after the approval of this act shall be absolutely null and void."

As this was the governing section at the time the last deed to the surplus was executed, unless the deeds were violative of its restrictive provisions, they must be sustained. It has been the policy of the courts, contrary to the general rule, to construe these restrictive statutes liberally in favor of the citizens of the five Civilized Tribes, assuming that the laws creating, retaining, and extending restrictions upon alienation were favorable to the Indians, and therefore doubtful expressions in such statutes, where possible, have been resolved in favor of the restrictions.

With this rule of construction in mind, let us now inquire what class of deeds are violative of section 5, supra. The most complete answer to this question we find in the section itself. It provides in substance that deeds made before or after the approval of this act, which affect the title to the lands allotted to allottees of the Five Civilized Tribes prior to the removal of restrictions therefrom, shall be absolutely null and void. It does not seem to us that the last deed executed by the plaintiff after he attained his majority violates either the letter or the spirit of the act. The deed was made after the plaintiff had attained his majority, is a grant in praesenti, and does not purport to affect the title to the land prior to removal of restrictions therefrom. The act of Congress does not in terms or by implication purport to confer upon the Indians the full power to alienate their lands upon reaching their majority, upon condition that they receive full value in consideration for their sale. The general purpose of Congress was to provide restrictions upon alienation during such period as would be sufficient in their judgment to fit the Indian wards of the government to deal at arm's length with their white neighbors in the matter of the disposal of their allotted lands. In the case at bar minority was the sole remaining disability imposed by law, both as to surplus and homestead, at the time the various deeds were executed. It will be observed that none of the acts of Congress removing restrictions attempt to make the right to convey, after restrictions are removed, depend upon the adequacy of the consideration received by the grantor. In that respect, after the restrictions upon alienation are removed, the Indian citizen stands upon an equality with the ordinary citizen of the state. Mere inadequacy of price, or any other inequality in the bargain, is not per se a ground to avoid his deed, either in equity or by the terms of the statute.

Practically all the local authorities cited by counsel for plaintiff in support of their contention construe section 16 of the Creek Supplemental Agreement (32 Stat. 500, c. 1323) and section 19 of the act of April 26, 1906. As we hold that section 5 of the act of May 27, 1908, is controlling in the case at bar, we do not deem the cases of that class cited by counsel to be in point. On the other hand, there is a line of cases wherein deeds executed subsequent to the act of May 27, 1908, were involved, in which it is unqualifiedly held that inadequacy of consideration alone does not constitute an equitable ground for setting aside such deeds, and that the provisions of section 5 of the act of May 27, 1908, does not affect a deed made after all restrictions upon the alienation of the lands therein described were removed. Lewis v. Allen, 42 Okla. 584, 142 Pac. 384; Henley v. Davis, 57 Okla. 45, 156 Pac. 337; McKeever v. Carter et al., 53 Okla. 360, 167 Pac. 56. So we conclude that, upon the plaintiff attaining his majority, the whole legal title to his land vested in him; that thereafter he could dispose of it as he saw fit—give it away, or sell it for any consideration, either legal or moral, which seemed to him sufficient. As the plaintiff herein voluntarily conveyed his land after attaining his majority, he cannot now, after the lapse of many years, repudiate the conveyance upon any except ordinary equitable grounds. This latest deed to his surplus allotment not being violative of any statute and there being no equitable grounds for setting it aside alleged or proven, it must stand. Since there was a legal as well as a moral obligation upon the plaintiff to restore the money received from Ellis in consideration for the void deed, it seems to us that his voluntary recognition of this obligation, after attaining his majority, was as commendable as such action is generally rare in this class of cases. That the discharge of a legal obligation is sufficient consideration to support a deed or contract finds support in the following authorities: Elliott on Contracts, 3851; Dunlap v. Green, 60 Fed. 242, 8 C. C. A. 600; Adams v. Vanderbeck, 148 Ind. 92, 43 N. E. 645, 47 N. E. 24, 62 Am. St. Rep. 497. That a mere moral obligation is sufficient is held in Muir v. Kane, 55 Wash. 131, 104 Pac. 153, 26 L. R. A. (N. S.) 519, 19 Ann. Cas. 1180; Hoover v. Wasson, 11 Cal. App. 589, 105 Pac. 945; Bank v. Mahon, 78 S. C. 408, 59 S. E. 31; In re Sutch's Estate, 201 Pa. 317, 50 Atl. 946; Brooks v. Bank, 125 Pa. 394, 17 Atl. 418. That an adult grantor has a right to give away his land is established by the following cases: Hartman v. Butterfield Lbr. Co., 199 U. S. 335, 26 Sup. Ct. 63, 50 L. Ed. 217; Carnegie v. Diven, 31 Or. 366, 49 Pac. 891; Neurenberger v. Lehenbauer (Ky.) 66 S. W. 15;

Jones v. Jones, 213 Ill. 228, 72 N. E. 695; Thorne v. Casand, 160 Ind. 566, 67 N. E. 257.

Moreover, we are impressed by the practical construction placed upon these restrictive statutes by the Secretary of the Interior and the Department of Justice. Prior to the passage of the act of May 27, 1908, making the enrollment records of the Commissioners to the Five Civilized Tribes conclusive evidence as to the age of any enrolled citizen or freedman of said tribes, the age of these allottees was often a matter of great uncertainty. The approved practice among those desirous of purchasing the land of allottees, whose alienability depended upon the age of the owner, was to rely upon the affidavit of the proposed grantor and his near kinsmen for the purpose of establishing age. This allottee, like many thousand others of the Indian Territory, adopted this practice. Afterwards, when the enrollment record was made conclusive evidence as to age, and it appeared that there was a discrepancy on that point between the enrollment record and the affidavits, the grantees in many instances sought to protect themselves from loss by taking other deeds after their grantor had attained his majority according to the enrollment records. In another class of cases there was great uncertainty as to the exact date when the restrictions upon certain classes of lands expired by limitation of law. In such cases different deeds covering the same tract were often taken on the various dates at which, by varying legal and judicial opinions, the restriction was presumed to expire. Still another element of disturbance was injected into Indian land titles by divergent legal and judicial opinion as to the correct determination of the important question involving Indian land titles finally settled in the case of Western Inv. Co. v. Marchie Tiger, 21 Okla. 630, 96 Pac. 602; Tiger v. Western Inv. Co., 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. In a large majority of these cases the transactions were not tainted by any actual fraud, or desire on the part of the proposed purchaser to evade any statute. The desire to procure a home was the uppermost consideration in the mind of the early settler, and he was simply endeavoring to do the best he could in that direction under the most adverse circumstances possible. The upshot of all this was what has become to be known as "the 30,000 fraud cases," commenced by the Attorney General under the advice of the Secretary of the Interior. Usually the action was commenced upon the assumption that the transactions were actually fraudulent as well as violative of the statute. In these cases the facts and circumstances of each case were examined into very carefully by high departmental officers, with a view of separating the fraudulent transactions from those entered into in good faith and for an adequate consideration, and a great number of them were settled by the issuance of new deeds to the original grantee after the removal of restrictions. And although it was the practice of the Department of Justice and the Secretary of the Interior to permit the consideration paid for the void deed to be counted as and for the consideration for the new deed, or a part thereof, the new deeds have never been considered as absolutely void by the administrative departments of government or the bench and bar of this state. In our judgment, each case of this nature brought before the courts should be governed by its own circumstances. The bona fides of each transaction should be carefully inquired into, for the purpose of protecting the Indian from being despoiled of his lands by fraud or overreaching of any kind. This is the peculiar function of a court of equity, and it should be exercised liberally in favor of the Indian wards of the government. But deeds made in good faith and apparently valid, which are attacked many years after their execution, and often after the land has come. into the hands of innocent purchasers, solely upon the ground that they are violative of some restrictive statute, should not be declared null and void, unless they are found to be clearly repugnant to the letter and spirit of the statute.

As to the homestead allotment, the trial court found that the title thereto was acquired by the defendant G. W. Ellis in substantially the following manner: On the 30th day of July, 1908, the plaintiff made and executed the deed to said homestead to the defendant J. B. Pollard. At the time this deed was made said plaintiff was a minor, and for this reason this deed to Pollard was absolutely void. Thereafter, and after the plaintiff had attained his majority, and for a sufficient consideration, he sold said homestead allotment to one Moore, who, for a valuable consideration, resold the same to Pollard. Thereafter, by mutual agreement between Pollard and Moore, the plaintiff, by direction of Moore, executed the deed for said homestead allotment directly to Pollard, who thereafter, on the 18th day of June, 1912, executed a deed thereto to said defendant G. W. Ellis. This finding of the trial court seems to be sufficiently supported by the evidence, and we therefore adopt the same as a basis for the conclusion we reach as to the validity of the last deed for the homestead allotment of the plaintiff executed after he attained his majority. The ground upon which the last deed to the homestead is attacked by the petition of the plaintiff is that on the 2d day of September, 1910, the plain-

tiff made another deed to said J. B. Pollard to his homestead allotment, and that said deed was made in compliance with the contract made at the time of the execution of the first deed to said Pollard. It will be observed that, as in the case of the transaction in relation to the surplus allotment, the petition contains no allegation of actual fraud in the transaction involving the homestead allotment. As all restrictions upon alienation, except as to minors, were removed from both the surplus and homestead allotments of freedmen, the validity of the deed to the homestead is governed by precisely the same principles of law applicable to the deed for the surplus allotment. Therefore what we have said in relation to the validity of the deed to the surplus allotment executed after the passage of the act of May 27, 1908, is also applicable to this branch of the case. It is sufficient to add that section 5 of the act of May 27, 1908, was the controlling statute here, and that for the reasons hereinbefore stated the deed to the homestead allotment, executed after the plaintiff had attained his majority, in the circumstances found by the court, does not constitute a violation of the terms of that section.

A great many additional propositions of law are presented by counsel for the respective parties in their very able briefs; but, as the conclusions we have reached on the points under discussion in this opinion are decisive of the case upon its merits, we do not deem it necessary to dwell in detail upon any other questions.

For the reasons stated, the judgment of the court below is affirmed.

All the Justices concur.