## CHUPCO et al. v. CHAPMAN et al.

No. 7570.—Opinion Filed Oct. 2, 1917.

Rehearing Denied Jan. 29, 1918.

Second Petition for Rehearing Refused Oct. 23, 1919.

(Syllabus by the Court.)

**1. Indians—Allotment—Inheritance.**

Katie Chupco, a full-blood Creek Indian woman, died after enrollment, on April 26, 1900. After her death an allotment was selected for her and patented to her heirs. Held, such heirs took the title to the land by inheritance, and not by purchase.

**2. Indians—Allotments—Removal of Restrictions—Acts of Congress.**

Act Cong. May 27, 1908, c. 199, 35 Stat. 312, entitled "An act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes," is a revising act, and was intended as a substitute for all former acts relating to the subject of such restrictions, and operated to repeal the provisions of Act Cong. April 26, 1906, c. 1876, 34 Stat. 137, and previous congressional enactments in conflict therewith on the same subject.

**3. Same—Conveyance of Inherited Lands—Validity.**

Section 9, Act Cong. May 27, 1908, removed restrictions against alienation of inherited lands, and authorized adult full-blood Indian heirs to convey such land, but provided, as an essential to the validity of such conveyance, that the same should be approved by the court having jurisdiction of the settlement of the estate of said deceased allottee.

Proof of the present payment of a consideration for a conveyance of inherited lands by a full-blood Indian heir is not essential to the validity of such conveyance.

**4. Same.**

In the year 1907 adult full-blood Creek Indian heirs executed conveyances to inherited lands that were not approved by the Secretary of the Interior, as provided by section 22 of the act of Congress of April 26, 1906. In the year 1910 the same heirs executed other deeds to the land to the same grantee for a recited consideration. The petition for the cancellation of said last-named deeds alleged that the same were taken in confirmation and ratification of the prior void deeds. Held, that the conveyances, having been approved by the proper court, as provided by the act of Congress of May 27, 1908, were valid, and conveyed title to the land.

**5. Same—Approval by Court.**

Under the provisions of section 9 of the act of Congress of May 27, 1908, the death of an allottee of the Five Civilized Tribes operated to remove all restrictions upon the alienation of said allottee's land. The first proviso in said section, "That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee," imposed a merely personal restriction on the full-blood Indian heirs. The restriction thus imposed was simply an incapacity to convey without the approval of the proper county court, similar to the disability of a minor to sell his lands.

**6. Same—"Restricted Lands"—Inheritance by Minors.**

Lands inherited by full-blood Creek Indian minors from a full-blood Creek allottee are not "restricted lands" within the purview of the proviso in section 6 of the act of Congress of May 27, 1908, prohibiting the sale or incumbrance of restricted lands of living minors, except by leases authorized by law, by order of the court, or otherwise.

**7. Same.**

Amos Chupco and Katie Chupco, full-blood Creek Indian allottees, died in Hughes county, Okla., leaving surviving both adult and minor full-blood Indian heirs. By virtue of the probate jurisdiction conferred by section 6 of the act of Congress of May 27, 1908, the probate court of Hughes county, Okla., was authorized to sell the inherited interest of the full-blood Indian minors in the allotments of the deceased allottees in conformity to the procedure for the sale of the lands of minors under the probate laws of the state, said court being the same court that had jurisdiction of the settlement of the estate of the deceased allottees, and the approval by the court of the guardianship sale, with direction to the guardian to execute a deed to the purchaser, was a substantial compliance with that part of section 9 of the act providing: "That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

Error from District Court, Hughes county; Tom D. McKeown, Assigned Judge.

Action by James C. Chupco and others against James A. Chapman and others. Judgment for defendants, and plaintiffs bring error. On rehearing, reversed and remanded, with directions.

Former opinion, published in 160 Pac. 88, withdrawn.

Lewis C. Lawson, for plaintiffs in error.

Harry H. Rogers and J. L. Skinner, for defendants in error.

RAINEY, J. James C. Chupco, Toney Chupco, Joseph Chupco, a minor, Tomy Chupco, Sarkarye Chupco, Pollie Yargee, Moser Chupco, by Johnson E. Tiger, as his guardian, and Dick Larney and Eddie Larney, minors, by John J. Troop, as their guardian, as plaintiffs, instituted this action in the district court of Hughes county, Okla., against James A. Chapman, H. B. Bonfoey, H. D. Seborn, Mada McAllister, Monitor Oil & Gas Company, and George S. Hooker, as defendants, for the recovery of two certain tracts of land, being the allotments of Katie Chupco and Amos Chupco, respectively. A demurrer was sustained in plaintiffs' petition, whereupon plaintiffs filed an amended petition. A demurrer was also interposed to this petition, which was sustained by the court, and plaintiffs given leave to amend their amended petition to ask for partition of the difference between two-sevenths interest and two-ninths interest in the allotment of Amos Chupco, if the plaintiffs desired so to do. Nothing further was done by plaintiffs, and within about two months after the demurrers were sustained to the amended petition, on motion of the defendants, the action was dismissed. From the order of the court dismissing the action and sustaining the demurrers to the amended petition, plaintiffs appealed to this court. For convenience we will refer to the parties in this opinion as they appeared in the trial court.

The material allegations in the petition necessary to be stated for a clear understanding of the questions presented and determined herein are as follows: That plaintiffs are full-blood Creek Indians, duly enrolled as such; that Katie Chupco, a full-blood Creek Indian, died in Hughes county, Okla., on April 26, 1900. Subsequent to her death there was selected for her allotment and patented to her heirs one of the allotments of land involved in this action, and that as such heirs the plaintiffs became the owners of said allotment, and their interest vested therein as follows: James C. Chupco, Toney Chupco, Joseph Chupco. Tomy

Chupco, Moser Chupco, and Sarkarye Chupco, each an undivided one-seventh interest, and Pollie Yargee and Dick Larney and Eddie Larney, together, an undivided one-seventh, or a one-twenty-first interest each. The petition alleged that Amos Chupco was a full-blood Creek Indian, and that as such there was allotted to him in his lifetime the other allotment of land involved in this action; that he died in Hughes county, Okla., in September, 1907, seized of the lands allotted to him; and that upon his death the plaintiffs became the owners of said allotment, and became vested with the same interests therein as in the allotment of Katie Chupco. The following conveyances were then alleged to have been executed and placed of record:

(1) August 19, 1909, deed executed by Joseph Chupco and wife to James A. Chapman for the grantors' interest in the Amos Chupco allotment.

(2) August 24, 1909, a deed executed by James C. Chupco to James A. Chapman for his interest in the allotment of Amos Chupco and Katie Chupco.

(3) November 30, 1909, a deed executed by Pollie Yargee and her husband to James A. Chapman for her interest in the allotments of Amos Chupco and Katie Chupco.

(4) October 22, 1909, a deed executed by the Manford Land Company to James A. Chapman to a portion of the allotment of Katie Chupco.

(5) November 23, 1909, a deed executed by L. G. Vance and A. J. Vance to James A. Chapman to all of the allotment of Amos Chupco and Katie Chupco.

(6) January 7, 1910, a deed executed by Pollie Yargee and husband, Toney Chupco and wife, Joseph Chupco and wife, and James C. Chupco to James A. Chapman conveying an undivided four-ninths interest in the allotment of Amos Chupco.

(7) January 7, 1910, a deed executed by James C. Chupco, Joseph Chupco, and Toney Chupco to James A. Chapman conveying an undivided three-sevenths interest in the allotment of Katie Chupco.

(8) March 21, 1910, a deed executed by John J. Troop, as guardian of the minor plaintiffs Dick Larney and Eddie Larney, to James A. Chapman, conveying all the right, title, interest, and estate of Dick Larney and Eddie Larney in both of said allotments.

(9) June 4, 1910, a deed executed by Charles Coachman, as guardian of Tomy Chupco and Sarkarye Chupco, to James A.

Chapman, conveying an undivided two-ninths interest of said minors in the allotment of Amos Chupco, and also conveying an undivided two-sevenths interest of said minors in the allotment of Katie Chupco.

(10) August 29, 1910, a deed executed by Johnson E. Tiger, as guardian of the minor plaintiff Moser Chupco, to James A. Chapman, conveying an undivided one-ninth interest in the allotment of Katie Chupco.

(11) September 6, 1910, a deed executed by James A. Chapman and wife, conveying the entire ollotment of Amos Chupco to Mada McAllister.

(12) September 22, 1910, a deed executed by E. James to Mada McAllister conveying a part of the allotment of Amos Chupco.

(13) January 14, 1913, a deed executed by James A. Chapman and wife to H. D. Seborn, conveying a part of the allotment of Katie Chupco.

(14) January 24, 1913, a mortgage executed by H. D. Seborn and wife to James A. Chapman.

The particular subdivision of each allotment alleged to be in the possession of the respective defendants was described in the petition. The petition is very voluminous, covering 34 pages of the case-made, and states many conclusions of law and much by way of argument, which makes it impracticable to copy the petition in full in this opinion, but we believe that we have stated all the facts necessary for a determination of the questions of law involved in the appeal.

It was repeatedly urged in the petition that all the conveyances executed by the adult plaintiffs and those executed by the guardians of the minor plaintiffs were null and void as being in violation of various acts of Congress relating to the alienation of allotted lands selected by or for Creek Indians. The relief asked was for possession of the lands in suit, for damages for unlawfully withholding the same, and for cancellation of all the instruments above set out as clouds upon the title of the plaintiffs.

From the foregoing statement of facts it appears that plaintiffs in their petition have pleaded the condition of the title of each of the defendants to the lands in controversy, and it is incumbent upon this court to determine, under the facts as pleaded by plaintiffs, what title, if any, the defendants, or either of them, acquired by virtue of the aforementioned deeds. If it appears under the law, as applied to the facts pleaded by

the plaintiffs, that by the series of conveyances alleged in plaintiffs' petition the plaintiffs divested themselves of all the title in and to the lands in suit, the demurrers interposed by the defendants to the plaintiffs' first amended petition were properly sustained, but, if said conveyances did not convey all the title of the plaintiffs in said lands, the trial court erred in sustaining the demurrers and in dismissing the action.

The deed made on the 22d day of October, 1909, of a portion of the Katie Chupco allotment to James A. Chapman, by the Manford Land Company and Pawnee Trust Company, and the deed made by L. G. Vance and A. J. Vance to both allotments to defendant James A. Chapman, and the deed made by E. James of a portion of the allotment of Amos Chupco to the defendant Mada McAllister may properly be eliminated from this discussion, for the reason that the defendants do not contend that they acquired any title to the lands by reason of these conveyances. The plaintiffs did not allege in their petition that the grantors in said conveyances had any interest in the lands attempted to be conveyed; so these conveyances would not add strength to the title of any of the defendants in the consideration of the demurrers.

We may also eliminate from the discussion the deeds executed on the 19th day of August, 1909, by Joseph Chupco and wife, purporting to convey to the defendant Chapman all the interest of the said Joseph Chupco in the allotment of Amos Chupco, and the deed executed on the 24th day of August, 1909, by James C. Chupco, purporting to convey to the defendant Chapman all his interest in both the Amos Chupco and Katie Chupco allotments, and the deed executed on the 30th day of November, 1909, by Pollie Yargee and husband, purporting to convey to the defendant James C. Chapman her interest in both of the allotments. These conveyances were not approved by the Secretary of the Interior, nor by the county court having jurisdiction of the administration of the estate of the deceased allottees, and while it is the opinion of three of the members of this court, including the writer, that said conveyances were valid as to the allotment of Katie Chupco, deceased, said conveyances are considered void by the majority of this court under the decisions of this court in the cases of Moffett v. Conley, 63 Oklahoma, 163 Pac. 118; Sampson v. Staples, 55 Okla. 547, 155 Pac. 213; Bruner v. Nordmeyer, 64 Oklahoma, 166 Pac. 126. But, as these same heirs later executed to the defendant Chapman deeds that were approved by the county

court having jurisdiction of the settlement of the estate of the deceased allottees, no further attention need be accorded these unapproved deeds, except in so far as it is contended that the validity of the subsequent conveyances by these same heirs was affected by these prior conveyances.

The deeds executed on January 7, 1910, by James C. Chupco, Joseph Chupco, and Tomy Chupco, purporting to convey to the defendant Chapman a three-sevenths interest in the entire allotment of Katie Chupco, and the deed executed on the same date by Pollie Yargee and her husband, Tomy Chupco and wife, Joseph Chupco and wife, and James C. Chupco, purporting to convey to the defendant Chapman an undivided four-ninths interest in the allotment of Amos Chupco, and which said conveyances were approved by the county court having jurisdiction of the settlement of the estates of the said Katie Chupco and Amos Chupco, were valid, and conveyed all the interest of said heirs in said land, not exceeding the particular interest stated in the deeds.

Assailing these conveyances, it is contended that the plaintiffs acquired their title to the lands allotted in the name of their deceased mother, Katie Chupco, by purchase and that the alienation and status of said lands are governed by the provisions of section 19 of Act April 26, 1906 (34 Stat. 137), and section 1 of Act May 27, 1908 (35 Stat. 312). It is provided by section 19 of the act of 1906 that:

"No full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek, or Seminole Tribes shall have power to alienate, sell, dispose of, or incumber in any manner any of the lands allotted to him for a period of twenty-five years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of Congress." 34 Stat. 144.

Section 1 of the act of 1908 fixes the status of the lands allotted before or after the passage of said act to allottees of the Five Civilized Tribes, as regards restrictions on alienation or incumbrance. Said act does not remove restrictions on lands allotted to living citizens of the Creek Tribe, enrolled as full-bloods, but authorizes the Secretary of the Interior to continue to remove such restrictions under authority theretofore granted by Congress.

In support of the contention that said land came to the heirs of Katie Chupco by purchase, and not by descent, and were restricted by section 1 of the act of May 27, 1908, the same as allotments made to full-blood members of the Creek Tribe in their own

right, counsel for plaintiffs in error has filed a very comprehensive brief, evidencing untiring energy and great zeal, wherein he has carefully analyzed practically all the decisions of the state and federal courts, and many others, relating to the nature of these estates. We have been deeply impressed with the argument advanced and fully realize the difficulty in harmonizing the views of the different courts in dealing with these intricate questions, but, as this particular question has already received the most careful and earnest consideration of this court, and a conclusion reached adverse to the contention here made in the case of Moffett v. Conley et al., 63 Oklahoma, 163 Pac. 118, we do not think anything would be gained by stating with particularity the many fine points urged by counsel for plaintiffs and our opinion thereon, especially in view of the fact that we believe that the conclusions reached by this court in the Moffett-Conley Case, supra, are supported by the better reasoning. With reference to the nature of these estates Mr. Chief Justice Sharp, speaking for the court, there said:

"It is first urged by the defendant in error that Jennie Hickory acquired her title to the lands allotted in the name of her deceased father, not by inheritance, but by purchase, and for that reason section 22 of the act of April 26, 1906 (34 Stat. at L. 137), requiring that all conveyances to inherited lands by heirs who are full-blood Indians are subject to the approval of the Secretary of the Interior, has no application. We have already seen that section 28 of the Original Agreement authorized allotments of the character in question to be made, and that it was there provided that lands to which the enrolled citizen, if living, would be entitled 'shall descend to his heirs' according to the Creek laws. Technically Jennie Hickory and her brother took their title directly from the tribe. The title taken, however, was not in their own right, or by reason of their own enrollment, but in the right of their deceased ancestor and by reason of his tribal enrollment. Moses Coney was one of the units counted in determining into how many allotable parts the tribal domain should be divided, and therefore was one of those to whom it was contemplated an allotment should be made. Levindale Lead & Zinc Co. v. Coleman, 241 U. S. 432 (36 Sup. Ct. 644) 60 L. Ed. 1080. The allotment selected and made subsequent to his death was made in satisfaction of the right which he, as one of the enrolled citizens and allotable units of the tribe, had in his lifetime. The heirs took their title, therefore, not because of their enrollment as tribal citizens alone, but because they were his heirs, because they were related to him by consanguinity, and succeeded to his rights at his death. That the children of Moses Coney did not take their title by purchase is, we think, settled by

both the decisions of this court and the federal courts in cases arising in this state. Barnett v. Way et al., 29 Okla. 780, 119 Pac. 418; Devine v. Harmon et al., 30 Okla. 820, 121 Pac. 219; Rentie et al. v. McCoy, 35 Okla. 77, 128 Pac. 244; Shulthis v. McDougal, 170 Fed. 529, 95 C. C. A. 615; Washington v. Miller, 235 U. S. 422, 35 Sup. Ct. 119, 59 L. Ed. 295; McDougal v. McKay, 237 U. S. 372, 35 Sup. Ct. 605, 59 L. Ed. 1001; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310."

See, also, Sunday v. Mallory, 237 Fed. 538, 150 C. C. A. 408, and Wadsworth v. Crump, 53 Okla. 728, 157 Pac. 713.

In the last-named case this court, in an opinion by Mr. Justice Hardy, held that:

The heirs "took the estate, not as an allotment to them, but as an inheritance just as effectually as they would have had the deceased member of the tribe died seised of the land."

It is next contended that all the conveyances executed in 1910 are void, for the reason that they were not executed in conformity to section 22 of the provisions of the act of April 26, 1906, which is as follows:

"That the adult heirs of any deceased Indian of either of the Five Civilized Tribes, whose selection has been made, or to whom a deed or patent has been issued for his or her share of the land of the tribe to which he or she belongs or belonged, may sell and convey the lands inherited from such decedent; and if there be both adult and minor heirs of such decedent, then such minors may join in a sale of such lands by a guardian duly appointed by the proper United States court for the Indian Territory. And in case of the organization of a state or territory, then by a proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian. All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe." 34 Stat. 145.

Construing the above language, this court, in an opinion by Mr. Justice Hayes, in the case of Wilson v. Morton et al., 29 Okla. 745, 119 Pac. 213, held that the procedure for the sale of inherited lands as provided by said act was exclusive, and, as there were both minor heirs and adult heirs of Katie Chupco and Amos Chupco in the case at bar, any conveyance of said lands by said heirs not made in conformity to the procedure provided in section 22 would be void, were it not for the fact as has been frequently announced by this court that the act approved May 27, 1908, c. 199, 35 Stat. 312,

was a substitute for all former acts relating to the subject of restrictions, and superseded the act of April 26, 1906. Lewis v. Allen, 42 Okla. 584, 142 Pac. 384; Henley v. Davis, 57 Okla. 45, 156 Pac. 337; McKeever v. Carter, 53 Okla. 360, 157 Pac. 56; Welch v. Ellis, 63 Oklahoma, 163 Pac. 321.

Under section 9 of the act of May 27, 1908, conveyances made by the full-blood Indian heirs of deceased members of the tribe were valid where approved by the court having jurisdiction of the settlement of the estate of the deceased allottee. MaHarry v. Eatman, 29 Okla. 46, 116 Pac. 935; Nichols et al. v. Cornelius, 52 Okla. 163, 152 Pac. 831.

It is also urged by counsel for plaintiffs that the deeds executed by the adult heirs in 1910, and approved by the county court of Hughes county, Okla., supra, are void, for the reason that they were given in ratification and in consideration of the deeds executed in 1909, and that the execution of said deeds was in contravention of section 19 of the act of April 26, 1906, rendering void every deed executed before or for the making of which a contract or agreement was entered into before the removal of restrictions. This question has also received the very careful consideration of this court, and has been decided adversely to the contention of plaintiffs.

In the case of McKeever v. Carter, 53 Okla. 360, 157 Pac. 56, in an opinion by Mr. Justice Hardy, with respect to a like contention, and with reference to the act of May 27, 1908, we said:

"There is no evidence of coercion, undue influence, or other grounds of equitable interference that would impeach either of said two last-named conveyances, and, if plaintiff was on the date of their execution an adult, he was capable in law of conveying said lands to whomsoever he chose, for any lawful consideration, and could, if he saw fit, give said lands away; and, when he executed and delivered these deeds, and accepted the consideration, said deeds were valid and binding conveyances and operated to transfer plaintiff's title to the grantee therein named, provided he had then reached his majority."

"This has been the construction placed upon that act by the department of justice. It is a matter of common knowledge to the bench and bar of this state that the United States, acting under the powers of its guardianship, instituted a large number of suits in the United States Court for the Eastern District of this state to cancel and remove as clouds upon the title of allottees a vast number of conveyances which, it was alleged, had been procured thereto in violation of the congressional restrictions. Since the passage of the act of May 27, 1908, it has been the policy of the department to investigate each individual case, and, where sufficient consideration has been paid for the lands purchased, and restrictions have been removed so that valid conveyances could be executed, to permit the title of the purchaser to be perfected by the execution of new conveyances, and to attain this result the lands conveyed have frequently been appraised, and, where the consideration paid in the former conveyances was not adequate, upon payment of an additional sum, which, together with the amount already paid, would equal the fair value of the land, the suits by the government have been dismissed, and many thousands of titles involved have in this way been quieted."

To the same effect is Welch v. Ellis, 63 Oklahoma, 163 Pac. 321. See, also, Hope v. Foley et al., 57 Okla. 513, 157 Pac. 727, and McCosar et al. v. Chapman, 59 Okla. 78, 157 Pac. 1059. The case of Ehrig v. Adams, as published in 152 Pac. 594, is relied upon by plaintiffs in error, but that opinion in the Ehrig-Adams case was later withdrawn, and the case decided in accordance with the views herein expressed.

From what we have said and the authorities cited in support thereof it conclusively appears that the adult heirs of Amos Chupco, and Katie Chupco, upon the approval of the deeds executed by them to Chapman in 1910 by the county court having jurisdiction of the settlement of the estate of said deceased allottees, divested themselves of all their title to the lands conveyed.

This leads us to a consideration of what title passed, if any, by virtue of the deeds executed by John J. Troop, as guardian of Dick Larney and Eddie Larney, minors, by Charles Coachman, as guardian of Toney Chupco, and Sarkarye Chupco, to James A. Chapman, and by Johnson E. Tiger, as guardian of Moser Chupco, a minor. It is the contention of counsel for plaintiffs that the county court of Hughes county was without jurisdiction to order or confirm the sales, and for that reason that the deeds executed in pursuance thereof were null and void.

The guardianship sale was had in all respects as provided by the laws of the state, except for some alleged irregularities that are not subject to collateral attack in this proceeding. In fact, no serious contention is made that said sales were void on account of any defect in the proceedings under the probate laws of the state.

The proceedings for the sale of the interest of the said minor heirs in the allotments in controversy were instituted and completed subsequent to the taking effect of the act of May 27, 1908 (35 Stat. at L. 312), entitled "An act for the removal of restrictions from part of the lands of allottees of the Five

Civilized Tribes, and for other purposes." Since under the decisions hereinbefore referred to this act was a complete substitute for and a repeal of all prior acts with reference to the alienability of the allotted lands of the Five Civilized Tribes, in determining whether or not the probate court of Hughes county had jurisdiction to order and confirm the sales of the inherited interests of these full-blood Indian minor heirs in the allotments of Amos Chupco and Katie Chupco, we must look to and be governed by said act. The question presented is one of statutory construction. The act consists of 14 sections. The portions of the act pertinent to the question under consideration are as follows:

"Section 1. * * * All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors, shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed-blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions. All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April 26th, 1931." (There is a provision in this section authorizing the Secretary of the Interior to remove such restrictions under rules and regulations to be prescribed by him.)

"Sec. 6. That the persons and property of minor allottees of the Five Civilized Tribes, shall, except as otherwise specifically provided by law, be subject to the jurisdiction of the probate courts of the state of Oklahoma. * * *" (The remainder of the first subdivision of section 6, and the second subdivision of said section relate to the appointment of local representatives of the Secretary of the Interior, and defines their rights and duties.)

The third subdivision of section 6 is as follows:

"Supplemental to the funds appropriated and available for expenses connected with the affairs of the Five Civilized Tribes, there is hereby appropriated, for the salaries and expenses arising under this section, out of any funds in the treasury not otherwise appropriated, the sum of ninety thousand dollars, to be available immediately, and until July first, nineteen hundred and nine, for expenditure under the direction of the Secretary of the Interior: Provided, that no restricted lands of living minors shall be sold or encumbered, except by leases authorized by law, by order of the court, or otherwise."

"Sec. 9. That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee: Provided further, that if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March fourth, nineteen hundred and six, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section one hereof, for the use and support of such issue, during their life or lives, until April twenty-sixth, nineteen hundred and thirty-one; but if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue hereinbefore provided for die before April twenty-sixth, nineteen hundred and thirty-one, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions: Provided further, that the provisions of section twenty-three of the act of April twenty-sixth, nineteen hundred and six, as amended by this act, are hereby made applicable to all wills executed under this section."

35 Stat. 312-315.

It is the contention of counsel for plaintiffs that, although by section 6 of said act jurisdiction is conferred on the probate courts of the state of Oklahoma over the persons and property of minor allottees of the Five Civilized Tribes, the first proviso of section 9, providing "that no conveyance of any interest of any full-blood Indian heir * * * shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee," restricts the land of deceased allottees in the hands of full-blood heirs, and that, by virtue of the terms of the proviso in section 6 such restricted lands of living minors cannot be sold by order of the probate court. But are said lands restricted by the above proviso of section 9? It will be noted that section 1 fixes the status of allotted lands as regards the restrictions on alienation during the lifetime of the allottee, and that section 9 fixes the status of allotted lands as regards restrictions after the death of the allottee, and the last-named section specifically provides:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land."

It is clear from the language of section 9 that after the death of an allottee of the Five Civilized Tribes the allottee's land, as such, is not restricted, except that under such terms of the second proviso of said section the homestead of a deceased allottee having one-half or more Indian blood who dies leaving issue surviving born since March 4, 1906, is made inalienable for the use and support of such issue during their life or lives, until April 26, 1931, unless restrictions against alienation are removed therefrom by the Secretary of the Interior. With the exception of such homesteads, restrictions are not on these inherited lands, but are personal to the full-blood Indian heirs.

While many of the adjudicated cases have not drawn the distinction, it has long been recognized by the courts, that restrictions on alienation may be either personal to the allottee or may run with the land. Oliver v. Forbes, 17 Kan. 113; Farrington v. Wilson, 29 Wis. 383; Bowling & Miami Inv. Co. v. United States, 233 U. S. 528, 34 Sup. Ct. 659, 58 L. Ed. 1080; Com'rs of Miami County v. Breckenridge, 12 Kan. 114; Gannon v. Johnston, 40 Okla. 695, 140 Pac. 430, Ann. Cas. 1915D, 522; Id., 243 U. S. 108, 37 Sup. Ct. 330, 61 L. Ed. 622; McMahon v. Welch, 11 Kan. 280.

All of the above cases recognize the distinction between the two classes of restrictions, and define the scope of the restrictions according to the language of the enactment or patent under consideration. Thus, in Gannon v. Johnston it was held by this court, and also by the Supreme Court of the United States, that the restrictions ran with the land, and in Farrington v. Wilson, supra, and McMahon v. Welch, supra, it was held that the restrictions were purely personal to the Indian. In the last-named case it was said:

"Under the treaty of 1855 the title conveyed by the United States to the competent Wyandotte Indians for all lands assigned to them was a complete, absolute, and unconditioned title, in fee simple. This title the Indians could, of course, convey, whenever and to whomsoever they chose. No restrictions, limitations, or prohibitions of any kind were imposed upon them. They could sell and dispose of their lands to the same extent and in the same manner that other people could sell and dispose of theirs. The incompetent Indians unquestionably held the same kind of title to their lands that the competent Indians did to theirs, except that the incompetent Indians could not sell or convey their lands for five years, and not then without the consent of the President of the United States. This restriction seems to be purely personal to the incompetent Indians, and does not affect their title to the land. It was simply an incapacity to sell, similar to the disability of a minor to sell his lands."

This reasoning, we think, exactly fits the case at bar. By the very terms of section 9 of the act death operated to remove all restrictions on the alienation of said allottee's land. If the heirs, or any of them, are Indians of less than full blood, they are authorized to sell or convey the land so inherited by them without any supervision. The heirs enrolled as full-blood Indians are also authorized to sell or convey their interest in such inherited lands, but the validity of any such conveyance depends upon the approval of the conveyances by the court having jurisdiction of the settlement of the estate of the deceased allottee. Since said restrictions are personal to the full-blood Indians, and do not run with the land, such inherited land in the hands of full-blood Indians is not restricted land within the meaning of the term as found in the proviso of section 6. It necessarily follows that the jurisdiction of the probate court of Hughes county to order and confirm the guardian sales of the interests of the full-blood minor plaintiffs in the inherited allotments in controversy was not defeated by virtue of said proviso in section 6.

In construing legislative enactments, it is the duty of the courts, if possible, to ascertain the intention of the Legislature or the enacting body; for this is the goal of all interpretation. What did Congress mean when it inserted the proviso "that no restricted lands of living minors shall be sold or incumbered, except by leases authorized by law, by order of the court or otherwise?" The recognized function or office of a proviso and a saving clause is the same; that is, to except some particular case from a general principle where from peculiar circumstances attending the case there would be some hardship if it were not excepted, to qualify, restrain, or otherwise modify the general language of an enacting clause, or to exclude some possible ground of misinterpretation that might exist if cases which the Legislature did not mean to include were brought within the statute. Endlich on Interpretation of Statutes.

In section 347, p. 662, Lewis' Sutherland, Statutory Construction, the author states that it is indispensable to a correct understanding of a statute to inquire, first, What is the subject of it? What object is intended to be accomplished by it? We should

also bear in mind that the nature of and the appropriate office of a proviso is to qualify some preceding matter, and it should be confined to what precedes it, unless it appears that it clearly applies to some other matter. Jefferson v. Winkler, 26 Okla. 653, 110 Pac. 755.

Generally a proviso should be construed with reference to the immediately preceding parts of the clause to which it is attached, but where it clearly appears from the context that such was not the intention of the Legislature, it will not be done, but a broader meaning will be given it, in order to give it the effect intended by the enacting body. The proviso under consideration is immediately preceded by language making an appropriation for salaries and expenses for representatives of the Secretary of the Interior, authorized by the act to inquire into and investigate the conduct of guardians and curators, etc., and from the very context it clearly does not qualify that part of section 6 making the appropriation.

The proviso restricts and qualifies the jurisdiction conferred by the first clause of section 6 on the probate courts of the state over the persons and property of minor allottees of the Five Civilized Tribes, and the subject of the proviso is the restricted lands of living minors. The only restricted lands of minors thus far mentioned in the act are those individual allotments of living minors that were restricted by section 1 of the act. What, then, was the purpose of the proviso? We think to exclude some possible ground of misinterpretation that might exist, if such lands of minors as were restricted by section 1, and that Congress did not mean to include, were made subject to sale by the probate courts under the jurisdiction conferred by section 6. This language of section 6, conferring jurisdiction on the probate courts of the state over the persons and property of minor allottees, is broad and comprehensive, and notwithstanding the fact that some of the lands of living minors were restricted by section 1, except for the proviso, it might be contended that section 6, coming later in the act, operated as a repeal of the restrictions placed by the terms of section 1 on certain allotments of living minors. and conferred jurisdiction on the probate courts to sell all the allotted lands of living minors. We observed in Jefferson v. Winkler, supra, that:

"One of the general rules of statutory construction applicable to provisos is that a proviso is intended to restrict or qualify some preceding matter, and does not apply to matter which follows. * * *"

According to Endlich on the Interpretation of Statutes, the question whether a proviso in whole or in part relates to and qualifies, restrains, or operates upon the immediately preceding provisions only of the statute, or whether it must be taken to extend in whole or in part to all the preceding matters contained in the statute, must depend upon its words and import, and not upon the division of the act into sections. Bearing in mind these salutary rules of construction, we conclude that the inhibition against the alienation of "restricted lands," as the words are employed in the proviso of section 6, supra, had reference only to "restricted lands" mentioned in the preceding provisions of the act, and not to inherited lands subsequently referred to and governed by section 9. Obviously it was the intention of Congress that the death of a minor allottee should operate to remove all restrictions on said allottee's land the same as from an adult allottee's lands, and we think the word "living" was inserted in the proviso to make clear the purpose of Congress that the proviso was not intended to withdraw the allotments of deceased minors from the operation of section 9.

The construction we have given the act harmonizes all its parts and effectuates the intent of Congress. In arriving at this view we have taken into consideration previous legislation with reference to the alienability of allotted lands after the death of the allottee. Thus it will be observed that by section 22 of the act of April 26, 1906, the adult heirs of any deceased Indian of either of the Five Civilized Tribes were authorized to sell and convey the land inherited from such decedent, and if there were both adult and minor heirs, then such minor heirs were authorized to join in the sale of such lands by a guardian duly appointed by the proper United States Court for the Indian Territory, and having in mind a possible change in the form of government, it was further provided that:

"In case of the organization of a state or territory, then by the proper court of the county in which said minor or minors may reside or in which said real estate is situated, upon an order of such court made upon petition filed by guardian."

Conveyances made under the provision of said section 22 by full-blood Indian heirs were to be subject to the approval of the Secretary of the Interior. It would seem, then, that Congress at all times from and after the passage of the act of April 26, 1906, intended that the allotments of deceased members of the Five Civilized Tribes should be alienable, and that the heirs should have the right to sell the land inherited from such

decedent, subject to supervision, in the case of full-bloods and minors. Under the act of April 26, 1906, conveyances by full-blood Indian heirs were subject to the approval of the Secretary of the Interior, and under the act of May 27, 1908, such conveyances were subject to the approval of the county court having jurisdiction of the administration of the estate of the deceased allottee, and the probate courts of this state were granted jurisdiction over the persons and property of minor allottees.

There is nothing in section 9 to indicate that Congress intended to draw a distinction between the adult full-blood heirs and the minor full-blood heirs with reference to the alienability of their inherited allotments, and it is reasonable to suppose that, if Congress intended that the interest inherited by full-blood minors in such lands should not be conveyed or subject to sale, it would doubtlessly have expressed such intention in unequivocal terms in section 9. There is nothing in the act of May 27, 1908, that evidences a change in the policy of Congress with reference to the alienability of such lands, except homesteads of certain allottees, which are governed by the second proviso of section 9.

It is next urged that, even though it be held that the probate court of Hughes county had jurisdiction to order and confirm the sale of the inherited interests of the minor plaintiffs in the allotments of Katie and Amos Chupco, said guardians' deeds were invalid, because not approved by the court having jurisdiction of the settlement of the estate of the deceased allottee. In other words, counsel says that, in addition to confirming the guardian's sale and directing the guardian to execute a deed pursuant thereto, it was necessary that the guardian's deed be approved in a separate proceeding by the county court. We do not think there is any merit in this contention. The statute provides:

"That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee."

The term "conveyance" is used in several senses. In the strict legal sense, the term imports a transfer of legal title to land. In the popular sense of the term, and as it is generally used by lawyers, it denotes any transfer of title, legal or equitable. Adams et al. v. Hopkins et al., 144 Cal. 19, 77 Pac. 712. And this, we think, is the sense in which it is used in the act; that is, that the transaction of transferring ownership from the full-blood Indian heir to the purchaser should have the approval of the court. The object of this provision, as often stated by the courts, is "to place the incompetent Indian on an equal footing with the person dealing with him, presumably competent, and the purpose of the approval was to require a disinterested agency to examine into the transaction and ascertain whether or not the Indian grantor had been overreached in the trade." The particular purpose of Congress in providing for the supervision of the sale by the court was doubtless to insure that the Indian heirs should receive full value for the transfer of the land. Hope v. Foley, 57 Okla. 513, 157 Pac. 727.

The procedure for transferring the title of the lands of minors is provided for by the Probate Code of the state. Under the procedure therein provided, it must be made to appear to the court that a necessity exists for the sale before the court acquires jurisdiction to order the sale, and after jurisdiction is acquired the guardian's sale is under the direction and supervision of the court. Thus the protection intended by Congress in providing that the conveyance should be approved is accorded the minors. Such a sale is judicial in its nature, and the guardian's deed, although the last step, is only a step in the proceeding to transfer the land from the minor to the purchaser. The transfer of the title is not made by the deed alone, but by virtue of all the probate proceedings. The petition for sale, order of sale, and order confirming sale are some of the essential steps by which the title is transferred. When the sales in the instant case had been made in all respects as required by the probate laws of the state, we are of the opinion that the court, in confirming the sales made by the guardians, and in directing the said guardians to execute deeds pursuant thereto, approved the transfer of the title from the minors to the purchasers, which, in effect, was an approval of the conveyances, and was a substantial compliance with the provisions of section 9 of the act.

It must not be overlooked, however, that the court that approved the guardian's sales is the same court having jurisdiction of the settlement of the estate of the deceased allottees. The question as to whether or not, in cases where the guardian's sales were conducted in a different county court from that having jurisdiction of the settlement of the estate of the deceased allottee, the approval of the latter court is required, is not before us, and we express no opinion thereon.

Plaintiffs' petition alleges that Toney Chupco, Sarkarye Chupco, and Moser Chupco

were entitled to recover an undivided one-seventh interest each in the allotment of Amos Chupco, while the guardian's deeds, which we have held to be valid to the extent of the interest conveyed, only conveyed an undivided one-ninth interest each, and if the plaintiffs can substantiate this allegation, they will be entitled to recover the difference between the one-ninth interest conveyed and the one-seventh interest alleged in the petition. From the petition we take it that this is the land the plaintiffs seek to recover from the defendant McAllister, and the demurrer of the defendant McAllister should have been overruled, and the court erred in sustaining the same.

It follows that this cause should be reversed and remanded, with directions to the trial court to sustain the demurrers of all the defendants, except the defendant McAllister, which should be overruled, and to take such other proceedings in the case as are not inconsistent with the views herein expressed.

All the Justices concur, except MILEY, J., disqualified and not participating.