**FREEMAN et al. v. MASTERS, Adm'r, et al.**

No. 21052. Opinion Filed Sept. 6, 1932.

Rehearing Denied Dec. 6, 1932.

E. B. Lykins, J. C. Powell, and John T. Young, for plaintiffs in error.

J. H. Finley, for defendants in error.

RILEY, J. This appeal presents the question whether or not lands allotted to a full-blood Chickasaw Indian, descended to full-blood heirs of an heir of the allottee, are subject to sale by order of the county court, in administration proceedings upon the estate of the heir of the allottee, for the payment of debts contracted by such heir in his lifetime and funeral expenses.

The county court held that it is, and upon appeal to the district court the holding and order of the county court decreeing the sale of such land was reversed and the land held not subject to sale for such purpose, and claimants appeal to this court.

The question has been definitely decided by this court against the contention of plaintiffs in error in Boyd v. Weer (1926) 124

Okla. 91, 253 P. 988. See, also, Kiel v. Baker (1923) 91 Okla. 128, 216 P. 640.

The judgment is affirmed.

LESTER, C. J., CLARK, V. C. J., and CULLISON and SWINDALL, JJ., concur. ANDREWS and KORNEGAY, JJ., dissent. HEFNER, J., not voting. McNEILL, J., absent.

## On Rehearing.

ANDREWS, J. (dissenting). The decision in this case was based upon the conclusion that the issue presented was definitely decided by this court in Boyd v. Weer, 124 Okla. 91, 253 P. 988. The only other authority cited was Kiel v. Baker, 91 Okla. 128, 216 P. 640. In the response to the petition for rehearing, the decision of this court in Brown v. Minshall, 83 Okla. 98, 202 P. 1037, was cited.

The decision in each of those cases was based upon a construction of the provisions of section 9 of the Act of Congress of May 27, 1908 (35 Stat. 312) chapter 199, here-inafter referred to as the 1908 act. That section was amended by the Act of Congress of April 12, 1926 (44 Stat. 239) chapter 115, hereinafter referred to as the 1926 act. Though the allottee died in 1927 and the decedent heir of the allottee died in 1928, that amendment was not considered in the decision of the majority in this case, and it had not been considered in the decisions in the other cases cited. By the decision of the majority we are applying a rule as to the construction of an act of Congress without considering or applying a material amendment to the act of Congress, which amendment was in force at the time of the death of the allottee and at the time of the death of his heir, the decedent whose estate is involved herein.

For the reasons stated, I dissent from the order denying the petition for rehearing in this case and express my views on the issue presented.

This is an appeal from an order of the district court of Murray county, Okla., made in an administration proceeding pending in that court on an appeal from the county court of that county.

The record shows that Sophie Kunauntubbee was enrolled as an adult full-blood Indian on the tribal rolls of the Chickasaw Tribe of Indians; that there was allotted to her distributive share of the land of the Chickasaw Tribe of Indians; that the same was conveyed to her by a homestead patent and by an allotment patent, both of which were received by her; that she died in 1927, intestate, seized and possessed of the land, leaving surviving her as her only heirs her three children, one of whom was Palmer Cunneutubby; that after her death, by order of the district court of Murray county, in a suit to partition among her heirs the land constituting her surplus allotment, the land in controversy in this action was assigned and set aside to Palmer Cunneutubby as his part of the land involved in the partition action; that Palmer Cunneutubby was an adult full-blood Chickasaw Indian; that he died intestate on or about the 31st day of December, 1928, in Murray county, Okla., seized and possessed of the real estate in controversy in this action, and leaving surviving him as his heirs his widow and children, all of whom were full-blood Chickasaw Indians; that upon a proper application to the county court of Murray county, one W. N. Lewis was appointed administrator of his estate and qualified as such; that claims against his estate were filed with the administrator, approved by him and allowed by the county court; that those claims consisted of notes and accounts and included claims for his funeral expenses and the expenses of his last sickness; that the county court ordered and directed the real estate in controversy herein to be sold by the administrator for the purpose of paying the indebtedness of Palmer Cunneutubby; that an appeal was taken from that order to the district court; that the district court reversed the order of the county court for the sale of the real estate; that the administrator died; that Earl Masters was appointed administrator, and that the action was revived in the name of Earl Masters as administrator.

The legal question presented for determination by this court is: Where land was allotted to A., a full-blood Chickasaw Indian woman, as her surplus allotment as a part of her distributive share of land of the Chickasaw Tribe of Indians, and upon the death of A. in 1927, intestate, it descended in part to B., a full-blood Chickasaw Indian child of A., and upon the death of B. in 1928, intestate, it descended to the full-blood Chickasaw Indian heirs of B., is such land subject to sale in an administration proceeding by order of the county court having jurisdiction of the estate of B. for the purpose of paying debts contracted by B.?

The statutes of Oklahoma authorize the sale of real estate comprising the estate of a deceased person for the purpose of procur-

ing funds with which to pay the debts of the deceased person, the expense of his last sickness, and his funeral expense. Homesteads are excepted from the rule for the reason that they do not constitute a part of the estate of the deceased person. It is not contended herein that the land involved in this action constituted, in whole or in part, the homestead of Palmer Cunneutubby. However, it is contended that Palmer Cunneutubby was a full-blood Chickasaw Indian and that the statutes of Oklahoma with reference to the administration of estates of deceased persons and the sale of the estates thereof for the purpose of paying the debts of the deceased persons are not applicable to the land in question. If they are not applicable, it is because of some treaty between the Chickasaw Tribe of Indians and the United States government, or some act of Congress pertaining to the allotted land of the Chickasaw Tribe of Indians.

To properly answer the question submitted will require an examination of a number of those treaties and a number of the acts of Congress.

An agreement made by the Commission to the Five Civilized Tribes with commissions representing the Choctaw and Chickasaw Tribes of Indians on the 23rd day of April. 1897, as amended, was ratified and confirmed by the Act of Congress of June 28, 1898 (30 Stat. 495, chapter 517). Hereinafter-that act will be referred to as the 1898 act.

In section 29 of that act there were a number of provisions which must be considered. Therein it was provided that in case of minor children, allotments should be selected for them, and that those allotments "shall not be sold during his minority." Therein it was provided that the homestead selected by the allottee from his allotment "shall be inalienable for 21 years from date of patent," and that the surplus allotment "* * * shall be alienable for a price to be actually paid, and to include no former indebtedness or obligation—one-fourth of said remainder in one year, one-fourth in three years, and the balance of said alienable lands in five years from the date of the patent. * * *" Therein it was provided "that all contracts looking to the sale or incumbrance in any way of the land of an allottee, except the sale hereinbefore provided, shall be null and void." Therein it was provided that "All the lands allotted shall be nontaxable while the title remains in the original alolttee, but not to exceed 21 years from date of patent.* * *" Summarized, those provisions of the treaty,

as ratified by the act, constituted restrictions upon alienation of allotted land, restrictions upon taxation of allotted land, and exemption of allotted land from debt.

Those provisions of the treaty indicated an intention to distinguish between alienation and taxation, for thereby it was provided that allotted land should be nontaxable during the period when it might be alienated so long as it had not been alienated; that is, so long as the title remained in the original allottee, but not to exceed 21 years from the date of the patent. In other words, all of the surplus allotment of an adult might be alienated at the end of five years from the date of the patent, but, if it was not so alienated, it remained nontaxable while the title remained in the original allottee, not to exceed 21 years from the date of the patent.

Those provisions indicated an intention to distinguish between alienation and exemption from debt, for otherwise it would not have been provided that all contracts looking to the sale or incumbrance in any way of the land of an allottee, except the sale specifically authorized, would be null and void. The contracting parties and Congress were not content to rely upon the provisions of the treaty and the act prohibiting the alienation of the homestead for 21 years from the date of the patent and the alienation of the surplus allotment, except as therein provided. They deemed it necessary, in addition to those provisions, to include the provision that all contracts looking to the sale or incumbrance in any way of the land of an allottee, except the sale therein provided, should be null and void.

It will be noted that no distinction was made therein between Chickasaw Indian allottees of full-blood and Chickasaw Indian allottees of less than full-blood; that the restriction upon alienation of the surplus allotment was not dependent upon the life of the allottee, and that there was no provision authorizing the sale of any portion of the allotment by the heirs of the Chickasaw Indian allottee prior to the time that the allottee could have alienated the portion of his allotment.

The Act of July 1, 1902 (32 Stat. 641, chapter 1362), was an act ratifying and confirming an agreement made by the Commission to the Five Civilized Tribes with the commissions representing the Choctaw and Chickasaw Tribes of Indians on the 21st day of March, 1902. Hereinafter that act will be referred to as the 1902 act.

In section 12 thereof it was provided that the homestead allotment "* * * shall be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of certificate of allotment. * * *" The provision in the 1898 act as to the homestead being inalienable for 21 years from the date of the patent was changed thereby to provide that the homestead allotment should be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the certificate of allotment.

In section 16 thereof it was provided that the surplus allotment "* * * shall be alienable after the issuance of patent, as follows: One-fourth in acreage in one year, one-fourth in acreage in three years, and the balance in five years; in each case from date of patent. * * *"

The provisions of the 1898 act, authorizing alienation of the surplus allotment "for a price to be actually paid, and to include no former indebtedness or obligation," and the provisions of that act as to allotted lands being nontaxable, were combined in section 15 of the 1902 act, wherein it was provided that no allotted land shall "* * * be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act, nor shall said lands be sold except as herein provided." As in the 1898 act, the provisions of the treaty and the act prohibiting the alienation of the land were not deemed to be sufficient, and, in addition to those provisions, it was deemed necessary to insert the provisions of section 15, that no allotted land should be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land might be alienated under the provisions thereof. By that provision the provisions of the 1898 act, with reference to exemption from taxation, were continued.

Under date of April 26, 1906, Congress enacted an act to provide for the final disposition of the affairs of the Five Civilized Tribes (34 Stat. 137, chapter 1876). Hereinafter that act will be referred to as the 1906 act. Therein material changes were made in the provisions hereinbefore referred to, and therein, for the first time, different restrictions were provided for the allotted land of Chickasaw Indians of full-blood than those provided for the allotted land of Chickasaw Indians of less than full-blood, although Congress had theretofore imposed different restrictions upon the allotted land of intermarried whites, freedmen, etc.

In section 19 thereof it was provided:

"That no full-blood Indian of the Choctaw, Chickasaw, Cherokee, Creek, or Seminole Tribes shall have power to alienate, sell, dispose of, or incumber in any manner any of the lands allotted to him for a period of 25 years from and after the passage and approval of this act, unless such restriction shall, prior to the expiration of said period, be removed by act of Congress. * * *"

Thereby the restrictions upon the alienation of the homestead and the surplus allotment of a Chickasaw Indian allottee of the full-blood were extended to "25 years from and after the passage and approval" of the act, with the provision that those restrictions might be removed prior to the expiration of that period "by act of Congress." It will be noted that that provision applied to full-blood Indians only, and that no change was made in the former provisions as to Chickasaw Indians of less than full-blood.

The act repealed the provisions of the prior acts only in so far as they were inconsistent therewith. The provisions of the prior act with reference to taxation and exemption were not repealed thereby.

In section 22 of that act, provision was made for the sale and conveyance by the heirs of a deceased Chickasaw Indian allottee, whose selection had been made or to whom a patent had been issued, of the share of the land of the Chickasaw Tribe of Indians which belonged to the allottee and which had been inherited by the heir of the allottee from the allottee, a provision being made requiring such of those heirs as were minors to act in such sale by a guardian duly appointed by the proper United States court for the Indian Territory, or by a proper court of the county in which the minor or minors resided or in which said real estate was situated, after the organation of the state of Oklahoma, upon an order of such court made upon a petition filed by the guardian. Thereby authority was granted for the sale of allotted land by the heirs of the allottee who inherited it, though the period for restriction upon alienation fixed by section 19, supra, had not expired, subject to the provision therein contained that "All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, un-

der such rules and regulations as he may prescribe." The approval of the Secretary of the Interior thereby required applied to conveyances by full-blood Indian heirs of Chickasaw Indian allottees of the inherited allotted land. By that provision, for the first time, the heirs of a Chickasaw Indian allottee were authorized to convey the surplus allotment inherited by them prior to the expiration of the time during which the allottee could have conveyed that surplus allotment.

An examination of the three acts hereinbefore referred to discloses the fact that certain provisions of each of the acts were in force after the effective date of the 1906 act, and that the three acts are required to be construed together to determine what restrictions existed upon the land of the Chickasaw Indians, what provisions had been made as to the taxation thereof, and what provisions had been made for the exemption thereof from debts.

Doubtless Congress had that fact in mind when it enacted the 1908 act, which was entitled, "An Act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes." Such is the effect of the decision of this court in Chupco v. Chapman, 76 Okla. 201, 170 P. 259, wherein this court held:

"Act Cong. May 27, 1908, c. 199, 35 Stat. 312, entitled 'An act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes,' is a revising act, and was intended as a substitute for all former acts relating to the subject of such restrictions, and operating to repeal the provisions of Act Cong. April 26, 1906, c. 1876, 34 Stat. 137, and previous congressional enactments in conflict therewith on the same subject"

—and the numerous decisions of this court to the same effect.

The distinction between the restrictions upon allotted land of Chickasaw Indians of full-blood and allotted land of Chickasaw Indians of less than full-blood, first applied in the 1906 act, were extended in the 1908 act. In section 1 thereof the status of the lands theretofore or thereafter allotted to allottees of the Five Civilized Tribes from and after 60 days from the date of the act, including intermarried whites, freedmen, mixed-blood Indians having less than half Indian blood, mixed-blood Indians having more than half Indian blood, mixed-blood Indians having three-quarters Indian blood, and full-blood Indians, was provided. As to enrolled full-blood Indians it was therein provided that homesteads and surplus allotments "* * * shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April 26th, 1931, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe."

By the provisions of section 22 of the 1906 act, as heretofore stated, Congress had authorized the Chickasaw Indian heirs of a deceased Chickasaw Indian allottee to sell and convey the land inherited from such decedent, although by section 19 of that act, such allotted land was restricted for a period of 25 years from and after the passage and approval of that act. In the 1908 act Congress went further and in section 9 thereof provided:

"That the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land. * * *"

In section 22 of the 1906 act, it had provided that:

"All conveyances made under this provision by heirs who are full-blood Indians are to be subject to the approval of the Secretary of the Interior, under such rules and regulations as he may prescribe."

In the 1908 act, as a proviso to the portion of section 9 thereof hereinbefore quoted, Congress provided:

"* * * That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee.* * *"

It will be noted that the language of that proviso differed materially from the language used in the 1906 act. The 1906 provision was as to conveyances by full-blood Indian heirs. The 1908 provision was as to conveyances of any interest of any full-blood Indian heir. The change in the approving agency from the Secretary of the Interior to the court having jurisdiction of the settlement of the estate of the deceased allottee is not material to this discussion. It is probable that had Congress intended the proviso in the 1908 act to be limited to conveyances by full-blood Indian heirs, it would have so said in the 1908 act, and since the language used in the 1908 act is more comprehensive and includes conveyances of any interest of any full-blood In-

dian heir, it is probable that Congress intended thereby to extend the provisions of the 1906 act to require the approval of any conveyance of any interest of any full-blood Indian heir without regard to whether or not the conveyance was by the full-blood Indian heir. The congressional intention in making that change is one of the factors to be considered in determining the meaning of the 1908 act.

Another thing that well may have been considered in determining the meaning of the 1908 act is the failure to include in the 1908 act the provision of the 1906 act that every deed executed prior to the removal of the restrictions or for the making of which the contract or agreement was entered into before the removal of the restrictions "be, and the same is hereby, declared void." This court held in Chupco v. Chapman, supra, and in the cases therein cited that proof of the present payment of the consideration for a conveyance of inherited land by a full-blood Indian heir was not essential to the validity of such conveyance, where the conveyance was made after the effective date of the 1908 act. By the omission of the 1906 provision from the 1908 act, Congress evidently intended to remove a restriction that had theretofore existed upon the alienation of allotted land.

The provision in section 9, supra, that the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land, was followed immediately thereafter by a provision:

"That if any member of the Five Civilized Tribes of one-half or more Indian blood shall die leaving issue surviving, born since March 4, 1906, the homestead of such deceased allottee shall remain inalienable, unless restrictions against alienation are removed therefrom by the Secretary of the Interior in the manner provided in section 1 hereof, for the use and support of such issue, during their life or lives, until April 26, 1931; but' if no such issue survive, then such allottee, if an adult, may dispose of his homestead by will free from all restrictions; if this be not done, or in the event the issue hereinbefore provided for die before April 26, 1931, the land shall then descend to the heirs, according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions: * * *"

That provision tends to clarify the portion of the section to which it applies. By it Congress, in effect, said that if a Chickasaw Indian allottee of the full-blood should die leaving issue surviving, born since March 4, 1906, the homestead of the deceased allottee should remain inalienable, notwithstanding the provision that his death should operate to remove all restrictions upon the alienation of his land, unless the restrictions upon the alienation were removed by the Secretary of the Interior, the homestead to remain for the use and support of such issue until April 26, 1931, but that if no such issue survived, the allottee, if an adult, might dispose of his homestead by will free from all restrictions, and if no such issue survived, and the allottee did not dispose of his homestead by will, or in the event the issue died before April 26, 1931, the land should descend to the heirs of the full-blood Indian allottee according to the laws of descent and distribution of the state of Oklahoma, free from all restrictions. It will be noted that that proviso applied only to the homestead allotment, and a homestead allotment is not involved in this action. However, the proviso showed congressional intention that the surplus allotment should descend to the heirs of the full-blood Indian allottee according to the laws of descent and distribution of the state of Oklahoma. The laws of descent and distribution of the state of Oklahoma were then in force, and Congress evidently was advised as to those provisions. The evident meaning of section 9, supra, was that, upon the death of a full-blood Chickasaw Indian allottee, his surplus allotment descended to his heirs according to the laws of descent and distribution of the state of Oklahoma.

The laws of descent and distribution of the state of Oklahoma provide that the property, both real and personal, of an intestate passes to the heirs of the intestate, subject to the control of the county court, and to the possession of any administrator appointed by that court for the purpose of administration. Section 11300, C. O. S. 1921. One of the purposes of the administration is the allowance and payment of the claims against the estate. Sections 1232 to 1255, C. O. S. 1921, and sections 1317 to 1353, C. O. S. 1921. The heir takes the property of the estate only when the claims against the estate authorized by law have been paid.

The provisions of section 9, supra, are qualified by the provisions of section 4 of the 1908 act. For the third time Congress recognized that the imposition of restrictions upon the alienation of allotted land of a Chickasaw Indian was not sufficient to exempt such land from sale for the debts

of the allottee. In section 4, supra, it provided:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes: Provided, that allotted lands shall not be subjected or held liable, to any form of personal claim, or demand, against the allottees arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law."

Thereby it was provided that allotted lands should not be subjected or held liable to any form of personal claim or demand against the allottees arising or existing prior to the removal of the restrictions, other than contracts theretofore expressly permitted by law. The effect of the provision was that, at the date of the removal of the restrictions, the allotted land should be free and clear from any form of personal claim or demand against the allottee, other than contracts theretofore expressly permitted by law. The provision of the 1908 act preventing the sale of the allotted land of a Chickasaw Indian for the purpose of paying the debts of the allottee after the death of the allottee, was not the provision of section 9, supra, requiring the approval of a conveyance of allotted land by the county court, but the provision of section 4, supra, providing that the allotted land should not be subjected or held liable to any form of personal claim or demand against the allottee arising or existing prior to the removal of restrictions, other than contracts theretofore expressly permitted by law. Such was the decision of this court in Kiel v. Baker, supra. Therein the land involved was the homestead of an enrolled minor Choctaw freedman allottee, who had died intestate in 1912 without marriage and without issue and while yet a minor. An administrator had been appointed for her estate, and the land had been sold at an administrator's sale for the purpose of paying debts against her estate. The action involved the legality of that sale. The sale was held to be void. That decision was based upon the provisions of section 15 of the 1902 act and section 4 of the 1908 act. The decision was correct under the provisions of those sections. By section 15 of the 1902 act, the treaty provision that lands allotted to Chickasaw Indians should not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which the land might be alienated,

under that act, and by section 4 of the 1908 act, providing that allotted land should not be subjected or held liable to any form of personal claim or demand against the allottee arising or existing prior to the removal of restriction, other than contracts theretofore expressly permitted by law, precluded the sale of the land of that allottee by the administrator in satisfaction of the debts of that allottee. No further citation of authority for the decision was necessary, but this court cited, in support of its decision, the decisions in Barnard v. Bilby, 68 Okla. 63, 171 P. 444; First State Bank of Hewitt v. Lowery, 72 Okla. 115, 178 P. 983; Mortgage & Debenture Co., Ltd., v. Burrows, 75 Okla. 94, 182 P. 238, and Sandlin v. Barker, 95 Okla. 113, 218 P. 519. In Barnard v. Bilby, supra, the validity of an administrator's sale of real estate was involved. The land attempted to be conveyed thereby was the homestead allotment of a duly enrolled Creek freedman, who was a minor at the time of his death on April 22, 1908. It was therein held that, under the acts hereinabove referred to, the land was not subject to the payment of the debts of the allottee. In First State Bank v. Lowery, supra, the land had been allotted to a Choctaw Indian of one-eighth blood, and it was held that that land could not be sold on execution after the allottee became of age to satisfy a judgment rendered against the allottee during his minority, the decision being based on the holding that minority was a restriction. In Mortgage & Debenture Co., Ltd., v. Burrows, supra, the same rule was applied to an attempt to sell land allotted to a Choctaw Indian of one-quarter blood on execution after she became of age, to satisfy a judgment rendered against her, after reaching her majority, upon an indebtedness incurred before she reached the age of 18 years, the decision being based on the holding that the conferring of majority rights under the state law did not remove the minority disability imposed by the federal law. In Sandlin v. Barker, supra, section 4 of the 1908 act was applied to the sale of land of two minor allottees, who died during minority and whose land was sold by an administrator, the decision being based on the conclusion that minority constituted a restriction within the meaning of the 1908 act.

It will be noted that in none of those cases was section 9 of the 1908 act in issue and that that section was not discussed in any of those decisions. Those decisions

were based upon the exemption provisions of the federal acts and treaties.

There are many decisions of this court applying the provisions of section 4 of the 1908 act and the similar provisions of the prior act as they were applied by this court in Kiel v. Baker, supra.

The defendants in error contend that the question in this case has been settled by the decisions of this court in Brown v. Minshall, supra, and Boyd v. Weer, supra.

In Brown v. Minshall, supra, it was held "* * * that the restriction contained in the proviso of said section 9, supra, runs with the land so long as such allotted lands are inheritable by full-blood Indian heirs, or until the restrictions expire by operation of law on April 26, 1931," the reference being to section 9 of the 1908 act. That case involved the question of whether or not an after-acquired title of a full-blood restricted Creek Indian inured to the benefit of her grantee in a deed executed by her prior to the time that she was vested with any title in the land. The land therein had been allotted to Susanna Berryhill, a full-blood Creek Indian. She died in 1899, intestate, a minor, without issue and unmarried, and left as her heirs at law her mother, a brother of half-blood, and a brother of full-blood, they being enrolled as full-blood Creek Indians. Louisa Brown, the mother, attempted to convey the entire estate. Thereafter one of the brothers of the allottee died, unmarried, intestate, and without issue, and his one-fourth interest in the estate passed to his mother, Louisa Brown. It was contended in the case that the title acquired by Louisa Brown after her attempted conveyance of the entire estate inured to the benefit of her grantees in those instruments of conveyance. The decision was that title might be acquired only in the manner prescribed by the congressional legislation, and that the doctrine of after-acquired title had no application; that the conveyances by Louisa Brown had no effect except to convey such right and interest as she owned at the time of those conveyances, and that the interest in the land, which she subsequently acquired by inheritance, did not inure to the benefit of her grantees. That decision was correct. However, in that case, this court said, without any necessity for it so saying, that Congress intended, by the provisions of section 9 of the 1908 act, that the lands of a deceased allottee should be restricted so long as the same were inheritable by full-blood Indian heirs, or until the

restrictions upon such lands expired by operation of law. No authority was cited for that statement, although authority was cited as to the general policy of Congress to protect the full-blood members of the tribes in the disposition of valuable property. The statement was made that "It is a fundamental rule uniformly adhered to by the courts in the construction of statutes to give them a reasonable construction." Had the author of the opinion looked at section 4 of the 1908 act, he would have found that therein Congress had provided that allotted lands shall not be subjected or held liable to any form of personal claim or demand against the allottees arising or existing prior to the removal of restrictions, other than contracts theretofore expressly permitted by law. A reasonable construction thereof is that Congress intended it to apply only to claims against the allottee, for had Congress intended that exemption provision to apply to the heirs of the allottee, it could easily have said that allotted lands shall not be subjected or held liable to any form of personal claim or demand against the allottees or their heirs arising or existing prior to the removal of restrictions, other than contracts expressly permitted by law. Or it could have used the language used in the 1898 act, in which it was provided that the surplus allotment "shall be alienable for a price to be actually paid, and to include no former indebtedness or obligation" and that "All contracts looking to the sale or incumbrance in any way of the land of an allottee, except the sale hereinbefore provided, shall be null and void." Or it could have used the language used in the 1902 act in which it was provided that no allotted land shall "be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land might be alienated under this act, nor shall said lands be sold except as herein provided." It did not use such language. It limited the exemption to claims or demands against the allottee. The statements unnecessary t the determination of the issue presented in that case were dictum.

In Boyd v. Weer, supra, the facts were submitted on an agreed statement. From those facts it appears that John McIntosh and Susan McIntosh, full-blood Creek Indians, were husband and wife. John McIntosh died intestate in 1903, seized and possessed of his allotment. He left surviving him his wife, a son, Commodore McIntosh, and a daughter, Annetta McIntosh.

Annetta McIntosh died intestate in 1904, leaving surviving her as her sole and only heirs at law her daughter, Etta Cox. Susan McIntosh died intestate in 1905, seized and possessed of her allotment, leaving surviving her as her heirs her son and granddaughter, Commodore McIntosh and Etta Cox, each of whom owned, after her death, a one-half interest in each of the allotments. On March 30, 1917, Commodore McIntosh deeded to Etta Cox an undivided one-half interest in the John McIntosh allotment, and Etta Cox deeded to Commodore McIntosh an undivided one-half interest in the Susan McIntosh allotment. Those deeds were approved by the county court having jurisdiction. Thereafter Commodore McIntosh died in 1923, intestate, seized and possessed of the land constituting the Susan McIntosh allotment, leaving surviving him his wife, a number of children, and a number of grandchildren. His wife was a white woman. His children were half-blood Indians, and his grandchildren were one-quarter blood Indians. An administrator was appointed and an attempt was made to sell the land to pay the debts of Commodore McIntosh. The one-quarter blood grandchildren, the one-half blood children, and the white wife, the only heirs, contested the sale. Therein it was contended that the one-half interest deeded by Etta Cox to Commodore McIntosh was restricted and, in the language of this court, "It is not questioned that the one-half interest not transferred was restricted." The case turned on whether the transaction by which Etta Cox conveyed one-half interest in the land to Commodore McIntosh was a partition of real estate or a sale. This court said:

"Under the view we take of the case, an undivided one-half interest of this land was acquired by Commodore McIntosh, deceased, as an estate of inheritance, and, upon his death, passed to his heirs free from liability of debts against his estate, and the other one-half interest was acquired by purchase and passed to the heirs subject to administration and any legal claims against his estate."

No authority was cited by this court in support of the statement with reference to the inherited portion of the land, doubtless for the reason, as stated by the court therein, that it was not questioned that the one-half interest was restricted. I do not understand why such an admission was made. The claims and demands sought to be enforced were not claims or demands against the allottee. They were claims and demands against an heir of the allottee. Section 4

of the 1908 act had no application. The restrictions upon the alienation of the allottee's land had been removed by the death of the allottee, under the provisions of section 9 of the 1908 act. Since the heirs of Commodore McIntosh were not full-blood, the conveyance of their interest in the allottee's land was not required to be approved by the court having jurisdiction of the settlement of the estate of the deceased allottee, for such approval was required only of a conveyance of any interest in the allotted land of a full-blood Indian heir of the allottee. Section 9 of the 1908 act. The statement was dictum. If we are to follow dictum, we could well follow the statement of this court in Terrell v. Scott, 129 Okla. 78, 262 P. 1071, in which this court said:

"The first part of section 9 removes all restrictions on alienation, and, but for the proviso, the full-blood heir could convey, mortgage or dispose of his property as any other citizen. The restriction therefore becomes personal to the full-blood Indian heir, and is not a restriction upon the land. Chupco v. Chapman, 76 Okla. 201, 170 P. 259. At page 208, in this case, it is stated:

" 'Since said restrictions are personal to the full-blood Indians and do not run with the land, such inherited land in the hands of full-blood Indians is not restricted land within the meaning of the term as found in the proviso of section 6.'

"The land being unrestricted, as the term is otherwise used in said act, he becomes the absolute owner except as to his personal restriction that 'any conveyance must be approved.' He can handle his land the same as any person sui juris, with the only restriction that certain acts of his must have the approval of a federal agency—in this case, the county court."

However, it is not necessary to overrule either Brown v. Minshall, supra, or Boyd v. Weer, supra, for those decisions involved inheritances prior to the 1926 act. Thereby section 9 of the 1908 act was amended. By the amendment no change was made in the provision thereof that the death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land, but the first proviso thereto was changed from:

"That no conveyance of any interest of any full-blood Indian heir in such land shall be valid unless approved by the court having jurisdiction of the settlement of the estate of said deceased allottee * * *"

—to

"* * * Provided, that hereafter no conveyance by any full-blood Indian of the

Five Civilized Tribes of any interest in lands restricted by section 1 of this act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator. * * *"

The proviso in the 1908 act was applicable to all full-blood Indian heirs of allottees without regard to whether or not the land was restricted prior to the death of the decedent. An allotment inherited by a full-blood Indian from his half-blood child was subject to the provisions of the proviso, even though the surplus allotment was not restricted prior to the death of the allottee. By the amendment, the proviso was changed so that it was applicable only to land which was restricted while it stood in the name of the allottee.

I have found no authority construing the 1926 act as to the issue presented in this case. Congress amended section 9 of the 1908 act. It did not amend section 4 of that act. It had more than one purpose in making the amendment. As heretofore stated, one of its purposes was to abolish the requirement for the approval of deeds of full-blood Indian heirs of allottees to land that was not restricted while it was in the name of the. original allottee. Another purpose was to more definitely state what full-blood Indian conveyances required the approval of the county court having jurisdiction of the settlement of the estates of the deceased allottee. The part of the act, as amended, material to this discussion, is as follows:

"The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: Provided, that hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this act acquired by inheritance or devise from an allottee of such lands shall be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator. * * *"

The proviso refers to that which precedes it. Preceding the proviso, the subject-matter was the removal of restrictions upon the alienation of the land of the allottee. The proviso applies to lands which, prior to the death of the allottee, were restricted and which were acquired by inheritance or devise from the allottee. It has no application to lands which were acquired by inheritance or devise from an heir of the allottee. The amendment must be construed in connection with section 4 of the 1908

act, which we have heretofore discussed. The confusion that existed over the meaning of the term "full-blood Indian heir" used in section 9 of the 1908 act need not exist under the act, as amended, for the word "heir" was omitted therefrom, and the conveyance referred to in the amendment is not that of "any full-blood Indian heir," but that of "any full-blood Indian." After the amendment, supra, by the language thereof, the approval by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator is required only where the conveyance is by a full-blood Indian of the Five Civilized Tribes of an interest in the land of the allottee which was restricted in the hands of the allottee at the time of his death and which was "acquired by inheritance or devise from an allottee of such land."

Whether the 1926 act was for the purpose of changing the law as stated in section 9 of the 1908 act, or whether it was for the purpose of more clearly stating that which was intended to be stated in the 1908 act, is immaterial herein, for under the act as amended, which is the congressional act applicable to the facts shown by the record in this case, the land involved in this action was not acquired by inheritance or devise from the allottee of the land, and the land is as much subject to the debts of Palmer Cunneutubby as the land of any other citizen of the state of Oklahoma is subject to debts.

In my opinion, the judgment of the district court of Murray county should be reversed, and the cause remanded to that court, with directions to vacate its judgment and to enter a judgment dismissing the appeal from the county court of Murray county.

I am authorized to state that Mr. Justice HEFNER and Mr. Justice KORNEGAY concur herein.